## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**Top Metal Buyers Inc.**, **Shelly Branson**, **Debra Mosby**, **Jesse Beechler**, **Mark Harrison**, **Don Gilliam**, **Shirley Ferrell**, and **Trenise Hill**, *on behalf of themselves and all others similarly situated,*

*Plaintiffs,*

v.

**Andrew Lopinot**, in his official capacity as treasurer of Saint Clair County; **Saint Clair County**, an Illinois political subdivision unit of government; **Joe Aiello**, in his official capacity as treasurer of Sangamon County; and **Sangamon County**, an Illinois political subdivision unit of government; *on behalf of themselves and all others similarly situated,*

*Defendants.*

Case Number: _____

## CLASS ACTION COMPLAINT

1. The Fifth Amendment to the U.S. Constitution, incorporated against the States through the Fourteenth Amendment, prohibits the government from taking private property without paying just compensation to the property's owner.

2. For decades, the counties of Illinois have violated this prohibition.

3. The violation proceeds as follows. First, people or businesses fall behind on paying their property taxes—often, only a few thousand dollars in back taxes. In response, the county treasurer executes a tax deed taking the property, either

into the hands of the county directly or to a tax-lien buyer who has purchased the back taxes on the property. Either way, that taking is for the entire value of the property, not only the value of the taxes owed. That surplus value—the difference between the taxes owed and the value of the property—is never returned to the former owner.

4. The U.S. Supreme Court recently held, unanimously, that this practice of seizing the surplus value in connection with property taken to satisfy a tax lien violates the Fifth Amendment's Takings Clause. *Tyler v. Hennepin County*, 598 U.S. 631 (2023).

5. The victims of that policy are spread across Illinois's 102 counties, though they are most often poor, elderly, and vulnerable. Stealing the surplus value from these individuals is not just unconstitutional, it is unconscionable.

6. This lawsuit seeks redress for these unconstitutional, uncompensated takings. More precisely, this suit seeks relief on behalf of a class of all victims of the counties' property value theft. And it seeks this relief against a class consisting of every Illinois County.

7. The class-action mechanism provides a clean, efficient vehicle for judicial resolution of the thousands of individual claims that would otherwise clog the courts.

8. It is time to end the practice of institutionalized property-value theft and to justly compensate thousands of Illinoisans who were victims of this practice.

## PARTIES – PLAINTIFFS

**9.** Top Metal Buyers Inc. is an Illinois corporation headquartered in East Saint Louis, Illinois.

**10.** Shelly Branson is a natural person resident in Cahokia Heights, Illinois.

**11.** Debra Mosby is a natural person resident in Swansea, Illinois.

**12.** Jesse Beechler is a natural person resident in Springfield, Illinois.

**13.** Mark Harrison is a natural person resident in Springfield, Illinois.

**14.** Don J. Gillam is a natural person resident in East Carondelet, Illinois.

**15.** Shirley Ferrell is a natural person resident in East Saint Louis, Illinois.

**16.** Trenise Hill is a natural person resident in Cahokia, Illinois.

**17.** Plaintiffs, and all others similarly situated, were victims of institutionalized theft by their county government thanks to Illinois's property tax statutes.

## PARTIES – DEFENDANTS

**18.** Andrew Lopinot is the duly elected treasurer of Saint Clair County, Illinois. As such, he is responsible for administering the property tax statutes for Saint Clair County. *See* 35 ILCS 200/Art. 21. He issues the tax foreclosure deed taking a property when a property's redemption period expires. He is sued in his official capacity as an agent of Saint Clair County.

**19.** Mr. Lopinot is president of the Illinois County Treasurers Association, the statewide trade association for county treasurers.

**20.** Saint Clair County, Illinois, is the municipal government responsible for Saint Clair County, which covers East Saint Louis and its environs. It is the employer of Mr. Lopinot and others who administer its tax scheme.

**21.** Joe Aiello is the duly elected treasurer of Sangamon County, Illinois. As such, he is responsible for administering the property tax statutes for Sangamon County. *See* 35 ILCS 200/Art. 21. He issues the tax foreclosure deed when a property's redemption period expires. He is sued in his official capacity as an agent of Sangamon County.

**22.** Sangamon County, Illinois, is the municipal government responsible for Sangamon County, which covers the state capital city of Springfield and its environs. It is the employer of Mr. Aiello and other employees who administer its tax scheme.

**23.** Acting under color of state law and pursuant to policies implementing Illinois statutes 35 ILCS 200/21-1 et. seq., the Defendants violated the rights of Plaintiffs and all others similarly situated (the plaintiff class) by stealing the value in their property over and above the amounts legally owed for back property taxes.

## JURISDICTION & VENUE

**24.** Jurisdiction exists under 28 U.S.C. § 1331 because the Plaintiffs and the proposed Plaintiff Class are individual persons (and their estates and heirs) and entities (such as limited liability companies or corporations) bringing claims under

the U.S. Constitution for violations of their civil rights by a local government. *See* 42 U.S.C. § 1983.

25. Jurisdiction for the declaratory relief is further appropriate under 28 U.S.C. § 2201(a).

26. Jurisdiction over the pendent or supplemental state law claims is appropriate under 28 U.S.C. § 1367.

27. Venue is appropriate in the Southern District of Illinois under 28 U.S.C. §1391(b)(1) & (2) because several Plaintiffs are residents of the Southern District of Illinois, the properties they formerly owned are in the Southern District of Illinois, the first named Defendant County and its officials are in the Southern District of Illinois, and the lead named defendant (Mr. Lopinot), who is the president of the Illinois County Treasurers Association, is in the Southern District of Illinois.

## FACTS

28. For decades, Illinois law has allowed counties to profit from the collection of unpaid property taxes. *35* ILCS 200/Art. 21. Illinois law permits counties, which collect property taxes, to sell property-tax liens to third-party investors or to keep the liens for themselves. Either way, the county or the tax-lien holder can charge usurious rates of interest through a redemption period (usually 30 months), during which the property owner can pay the back taxes with fees and

interest. If the property owner fails to do so, the lien-holder (whether the county or the investor) can file for a tax foreclosure on the home.

29.    A taking occurs when the County Treasurer, such as Mr. Lopinot, issues a tax deed transferring the entire property from the taxpayer to the county or other lienholder. The forecloser can either keep the property or sell it; either way, any value over and above the back taxes goes to the forecloser, not the former owner. *See* 35 ILCS 200/21-200 et seq.

30.    This is what happened to Top Metal Buyers, Inc. TMB formerly owned a property located at 1101 Cleveland Ave., East Saint Louis, IL 62201. TMB owed $44,089.58 on the property. The fair market value of the property, however, was over twice that: $102,279.[1] When the treasurer of Saint Clair County issued a tax deed and took the property, TMB lost over $55,000 in surplus value.

31.    This is also what happened to Shelly Branson. Mr. Branson formerly owned a single-family home at 221 Pittsburg Dr., East Saint Louis, IL 62203. He fell behind on paying the property taxes in the wake of his wife Toni's death several years ago. Mr. Branson owed $14,145 on the property. The fair market value of the property, however, was five times that--$76,756. When the treasurer of Saint Clair County issued a tax deed and took the property, Mr. Branson lost $60,000 in surplus value.

---

[1] All estimates of fair market value for these properties are taken from a national property valuation website like Zillow or Redfin.

32. Debra Mosby has a similar story. She formerly owned her home at 5705 North Park Dr., East Saint Louis, IL 62204. She owed $14,812.87 on the property. Saint Clair County's treasurer took the property through a tax deed, costing her almost $30,000 in stolen value, as the fair market value was $53,607.

33. Jesse Beechler formerly owned the house at 2327 S. 15th St., Springfield, IL 62703. He owed $6,808.11 in taxes and fees on the property. The treasurer of Sangamon County took the property and sold it for $57,500, costing Mr. Beechler $50,000 in stolen value. (The fair market value was estimated at $56,700).

34. Mark Harrison formerly owned the home at 2913 S. 12th St., Springfield IL 62703. He owed $5,681.90 on the property. Its fair market value was $60,737. When the Sangamon County treasurer issued the tax foreclosure taking the property, he took $55,000 in value.

35. Don Gilliam formerly owned the home at 118 Front St., East Carondelet, IL 62240. He owed $10,178.20 for the property. Its fair market value was $112,700. When the Saint Clair County treasurer executed the tax deed, Mr. Gilliam lost over $100,000 in value.

36. Shirley Ferrell formerly owned her home at 8512 Church Lane, East Saint Louis, IL 62203. She thought her property taxes were being taken out with her mortgage payments. Because the taxes were unpaid, they were sold to a tax buyer. She owed $7,320.13 for redemption, but the fair market value of the

property was $84,708. Eventually the Saint Clair County Treasurer issued a tax deed, and she lost over $75,000 in value.

37. Trenise Hill formerly owned the home at 808 Otto Street, Cahokia, IL 62206. She owed $8,964.27 for redemption, but the fair market value of the property was $58,200. Eventually the Saint Clair Treasurer issued a tax deed, and she lost almost $50,000 in value.

38. The stories of these plaintiffs illustrate the harsh reality of Illinois's property tax system. For decades, the State and its counties have conspired to knowingly and unconstitutionally steal value, often a lifetime of savings, from homeowners and small businesses of limited means to boost their own bank accounts.

39. These were not one-off events. They are typical of a systematic, institution-alized, multi-decade practice and policy undertaken pursuant to state law to profit from property owners beyond the taxes and fees those property owners owed.

40. The policy starts with a state statute that permits this systemic abuse. The statute relies on the County Treasurer, who issues the judgment book, auctions the liens, collects the fees, and most importantly, issues the tax deed.

41. That act—the issuance of the tax deed transferring ownership—constitutes the taking of property that implicates the Fifth Amendment's Takings Clause.

42. In many instances, the county government retains the tax lien and directly forecloses, retaining the surplus value for itself. Sometimes the county executes

the tax deed, sells the property, and keeps the profits; other times the county retains the title to the property. Either way, the county retains the surplus value over and above the back taxes and interest.

43. Alternatively, county treasurers sell tax liens to private investors at auction. Most counties do so on an annual basis.

44. Counties make more money than they otherwise would by selling liens because purchasers get to keep the surplus over and above the back taxes in the event they foreclose on the property. In other words, even in those instances where the county does not retain the surplus value directly, the county profits from its unconstitutional policy because it gets a higher price for liens at auction than if, as the Constitution requires, the third-party investor could not keep the surplus value.

45. The theft of surplus value is only possible when the government authorizes it through a property-tax deed.

46. Private entities are not so authorized. When a bank forecloses on a property after a debtor defaults on a mortgage, the bank may take the property but it must return the surplus equity in the property above the mortgage to the debtor.

47. By contrast, when a county issues a tax deed taking a property, the surplus value in the property above the back taxes is not returned.

**48.**     Most states require county and municipal governments to return the surplus

value to the owner; Illinois is one of the few states that authorizes this theft of

surplus value.

**49.**     The State of Illinois's possible answer to Plaintiffs' problem is no solution at

all. The State mandates that on every tax-lien sale, a fee is paid into an indem-

nity fund. 35 ILCS 200/21-295. That fee is currently capped at $20 in all coun-

ties under three million inhabitants, and $80 in all counties with more than three

million inhabitants. *Id.*

**50.**     These small fees leave county indemnity funds woefully, structurally under-

funded. The indemnity funds thus do not have—and never will have—sufficient

funds to repay the surplus to which property owners like the plaintiffs are enti-

tled.

**51.**     For example, the indemnity fund in the largest county in Illinois—Cook

County—is currently $22 million in debt and has an eight-year backlog in mak-

ing payments. Sidnee King, *Tax sale process hits Black homeowners hardest*, Illinois

Answers Project (Nov. 17, 2022).[2] A study by the Pacific Legal Foundation, a

think tank and legal advocacy organization for homeowners, indicates that

nearly 1200 homeowners in Cook County had $136 million in home value stolen

from them from 2014-2021.[3] Yet the fund had only 230 claims pending against

---

[2] https://illinoisanswers.org/2022/11/17/tax-sale-process-hits-black-homeowners-hardest/

[3] https://homeequitytheft.org/illinois

it, indicating many homeowners are unaware of the fund or do not qualify for its coverage.

52.     Upon information and belief, other counties have similarly underfunded accounts compared to the potential demand on them.

53.     Upon information and belief, counties do not provide notice to homeowners of the existence of the indemnity fund.

54.     Moreover, the indemnity fund statute makes its funds available only to residential properties with four or fewer units (*i.e.*, individual homes, duplexes, triplexes, and quadraplexes). 35 ILCS 200/21-305(a)(1). That means apartment buildings and commercial properties such as that owned by Top Metal Buyers Inc. are excluded.

55.     Moreover, the maximum recovery from the indemnity fund for a 1-4 unit residential property is $99,000. *Id.* In a state where the average home is worth just shy of $250,000,[4] many property owners are not eligible to reclaim the entire home-equity surplus. Plaintiff Don Gilliam, for instance, lost over $100,000 in the difference between his property's fair market value and his redemption amount, so he could not achieve a complete recovery from the indemnity fund.

56.     After the Supreme Court's unanimous decision in *Tyler* condemning these practices, the Defendant Class should have refunded the surplus value that the

---

[4] https://www.zillow.com/home-values/21/il/

counties stole from the Plaintiff Class. Upon information and belief, none has done so, thus continuing the violation of Plaintiffs' rights.

57. Upon information and belief, the Defendant Class has continued its practice and policy, pursuant to an unchanged statute, of taking and retaining surplus value.

## PLAINTIFF CLASS

58. A class action is the simple, efficient way to ensure that all Illinois homeowners and small businesses that have been victims of this theft receive just compensation for the gross violation of their constitutional and legal rights.

59. To that end, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Class:

All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois; (2) their property was subject to a tax deed taking by a county treasurer; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

60. Plaintiffs are aware of two similar actions in the Northern District of Illinois. *Sharritt et al. v. DuPage County, et al.*, No. 1:23-cv-15838, seeks to certify a plaintiff class on behalf of property owners with similar legal claims in DuPage County, Kane County, Lake County, Will County, Winnebago County, Boone

County, Carroll County and Peoria County. The plaintiffs' proposed class has not been certified yet. The parties are currently briefing on a motion to dismiss.

61.     Separately, *Bell v. Pappas*, No. 1:22-cv-07061, seeks to certify a plaintiff class on behalf of property owners with similar legal claims in Cook County. The case was filed in 2022, but had been stayed pending *Tyler*. With *Tyler* decided, active litigation has resumed. The class has not been certified yet. There are presently motions to dismiss pending fully briefed.

62.     Therefore, in the alternative event that those plaintiff classes are certified before this plaintiff class here is certified, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Subclass:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois other than in Cook and/or DuPage, Kane, Lake, Will, Winnebago, Boone, Carroll, and Peoria counties; (2) their property was subject to a tax deed taking by a county treasurer; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

63.     Excluded from the Class or Alternative Subclasses are: (i) any judge or magistrate presiding over this case and their family members and staff; and (ii) Plaintiffs' counsel. Plaintiffs reserve the right to modify the class definition as the case unfolds and further facts are discovered.

**64.** Upon information and belief, the Plaintiff Class and Subclasses include thousands of people and companies whose homes or business properties were taken through a tax deed. Bringing such suits individually would clog Illinois courts, whereas a single class proceeding would result in an efficient adjudication, such that the requirement of numerosity is met. The information as to who belongs to the class can be discerned from data held by the Defendant Class and Subclasses members. Moreover, the present addresses of members of the Class and Subclasses can be ascertained from public records, and members of the Class and Subclasses can be reached by multiple methods of communication.

**65.** There are questions of law and fact common to all members of the Class and Subclasses. All have been subject to the same process laid out by Illinois law and executed by all counties pursuant to these statutes.

**66.** The questions of law are common across the Class and Subclasses:

- Does the Defendants' policy of executing a tax deed where surplus value was not returned to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of executing tax deeds and taking property without returning surplus value constitute a taking without just compensation under the Illinois Constitution?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiffs without an eminent domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiffs have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiffs?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiffs?

67.     The questions of fact are also simple: Were the Class and Subclass members stripped of their property by a county treasurer's tax deed? And did the fair market value of the property, as determined by a neutral third-party data provider, exceed the back taxes and interest owed on the property?

68.     Once the law and facts are resolved, the question is simply how to return to the Plaintiff Class or Subclasses the amount stolen from them by the Defendant Class of counties.

69.     The fair market value of each property can fairly be determined from commercially available data. The fair market value of each property can be calculated in a way that is simple, straightforward, and universally applicable to the entire Plaintiff Class and Subclasses. *See United States v. 50 Acres of Land*, 469 U.S. 24, 25-26 (1986); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (fair market value is the appropriate standard to determine just compensation for a taking).

70. The claims are typical across the entire class: all members of the Plaintiff Class and Subclasses were the victims of the same property tax statutes administered by the counties in conformance with state law.

71. Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. All Plaintiffs are members of the Class and certain plaintiffs are members of the various Subclasses. Plaintiffs have no interests adverse to the interests of the Class and Subclasses. Plaintiffs are committed to prosecuting this action and have retained competent, experienced counsel who have had substantial success prosecuting class action cases and claims based on constitutional law.

72. Moreover, Plaintiffs have structured this case in a way that (1) reaches all counties in Illinois through the Defendant Class, (2) includes all plaintiffs whether homeowners or small businesses, (3) includes a demand for just compensation calculated based on fair market value, (4) includes a demand for additional damages beyond just compensation for the surplus value stolen, (5) addresses the statutory indemnity fund, and (6) covers all plaintiffs whether their property was sold or retained by the forecloser.

73. Questions of law or fact common to the Class and Subclasses predominate over questions affecting individual members of the class, as the only individualized question—the size of the surplus taken from any given class member—can be quickly and easily determined using commercially available data.

**74.**     Similarly, the Defendant Class's actions apply generally to the whole class, so final declaratory and damages relief is appropriate and indeed necessary to rectify the wrongs the counties have perpetrated on the class.

**75.**     A class action is the optimal vehicle to fairly and efficiently resolve the question of property value theft for its victims statewide. The alternative is thousands of individual lawsuits, which would clog the courts. Moreover, such lawsuits are unlikely to the extent that the Plaintiff Class and Subclasses are overwhelmingly composed of low-income and elderly residents and those for whom English is a second language, such that the class action is the optimal vehicle for achieving justice for the greatest number of persons. A class action ensures all victims of property theft are justly compensated without burdening the courts or Defendant units of government with numerous lawsuits.

## DEFENDANT CLASS

**76.**     It is further appropriate to certify a defendant class action. Defendant classes are most often used and most appropriate in cases against governmental units, such as this case where all counties acted in accord with the same state statutory scheme. *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002).

**77.**     To that end, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, against the following class:

All Illinois county governments and their elected treasurers and sheriffs who executed or aided in the execution of tax-deed foreclosures on properties where

the fair market value of the property exceeded the amount of back taxes and interest owed on the property at the time of the foreclosure.

78. All Illinois county governments are political subdivisions of the State subject to the Fifth Amendment to the U.S. Constitution via the Fourteenth Amendment. They are all also "persons" subject to 42 U.S.C. Section 1983, the civil rights statute.

79. All Illinois county governments and their responsible officers (the treasurer and sheriff) acted uniformly in the relevant respects in their administration of Illinois's property tax statute.

80. There are 102 Illinois counties. Bringing all of them into an action with separate counsel would be utterly impractical and make case administration impossible. Resolving them through class-actions against individual counties could also create 102 separate cases and could create conflicting or differing resolutions, resulting in unfairness between county residents.

81. Common questions of law and fact exist as to all counties: all counties acted pursuant to the same state statutes.

82. The questions of law are common across the class:

- Does the Defendants' policy of executing a tax deed where surplus value was not returned to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of executing tax deeds and taking property without returning surplus value constitute a taking without just compensation under the Illinois Constitution?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiffs without an eminent-domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiffs have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiffs?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiffs?

83.     After a legal conclusion in this case is reached, each county can be contacted through its responsible officials to access the data necessary to determine the Plaintiff Class members in that county and that county's individual financial obligations to those Class members.

84.     Defendants are adequate Defendant Class representatives because their interests do not conflict with the interests of Defendant Class Members they represent. Each County retains and distributes surplus proceeds from property foreclosed upon within that County. The distribution of the surplus proceeds remains within each County and does not conflict with distribution within other counties. Defendants share the same defenses regarding such distribution. Moreover, the treasurer of Saint Clair County is the president of the Illinois

County Treasurers Association, which makes him a natural representative for the class.

## DAMAGE TO PLAINTIFF CLASS BEYOND THE STOLEN VALUE

85.    Home ownership is a core pillar of the American dream. Home ownership is correlated with physical health, mental and emotional health, financial prosperity, a secure retirement, and a solid family life. *See* Luke A. Munford, et al., *Is owning your home good for your health? Evidence from exogenous variations in subsidies in England*, 39 Economics and Human Biology 100903 (2020).

86.    When members of the Plaintiff Class lose their entire home value, they are literally forced out on the streets with nothing. It is virtually impossible for them to move into a new home when they have zero money for a down payment after all their equity has been stolen by their government. They end up in apartments, on the couches of friends and neighbors, or on the streets. Their children are forced to move schools, and their entire lives are disrupted. The loss of a home to foreclosure correlates to mental and emotional strain, a decline in physical health, a decline in academic achievement for students in the home, and a multi-generational loss of wealth. *See* Alexander C. Tsai, *Home foreclosure, health, and mental health: a systematic review of individual, aggregate, and contextual associations*, 10 PloS one e0123182 (April 7, 2015).

87.    Loss of a home is not just about its immediate effects: it is also about the loss of dignity. Homeownership is a mark of pride, of responsible membership in the

community, of citizenship in a neighborhood, of stake in a place. It represents a tremendous blow to a person's standing in the community to be forced out on the street after a foreclosure. Gregory S. Alexander, *Property, Dignity, and Human Flourishing*, 104 Cornell L. Rev. 991 (2019).

88.    The same is true for those who lose commercial properties. An owner-occupied duplex, a family-run restaurant, or a small business already live on the narrowest of margins. The loss of all value in a commercial property can bankrupt a small business. The owner of that business has to lay off employees, cancel vendor contracts, and stop serving customers. An entire community is affected.

## UNCONSCIONABLE BEHAVIOR BY DEFENDANT CLASS

89.    The Defendant Class's cavalier attitude towards the constitutional rights and human dignity of the Plaintiff Class and Subclasses is outrageous, displaying a consistent indifference that shocks the conscience. For starters, one would think it obvious that intentional government-organized theft on a massive scale would be wrong, plain and simple. But numerous academic and advocacy reports made Illinois state and local governments aware that their policies were outrageous and especially damaging to their most vulnerable populations: the elderly, communities of color, and those who speak English as a second language. Yet they chose to persist in these policies even knowing of their effects because they wanted the cash.

**90.**    One of the nation's premier academic experts in this area finds "greed and cruel indifference to their victims" pervasive in the tax foreclosure industry. Andrew W. Kahrl, *Unconscionable: Tax Delinquency Sales as a form of dignity taking*, 92 Chicago-Kent L. Rev. 905, 932 (2017). As Professor Andrew Kahrl of the University of Virginia points out in an article for the Chicago-Kent Law Review, "Because minority neighborhoods have historically been subject to discriminatory overtaxation and lower property values as result of segregation and 'redlining,' African American homeowners have been and remain more vulnerable to predatory tax buying." He continues, "Tax buying has inflicted a significant, if underappreciated, economic toll on black America. It contributed, in no small measure, to the precipitous decline of black landownership over the second half of the twentieth century (from over 15 million acres in 1910 to 2.3 million acres in 1997), prevented African American communities from becoming partners in and beneficiaries of real estate development in some of America's most vibrant markets accelerated the deterioration of urban minority neighborhoods and stymied efforts at recovery, and exacerbated the racial wealth gap. It has also left deep emotional scars on victims, robbing them of their dignity in the course of taking—or threatening to take—their property."

**91.**    "To homeowners facing eviction, predatory tax buying was a cruel, vicious, indeed unconscionable, act." *Id.* at 923. He concludes, "It is unconscionable, but perhaps not surprising, that many states allow private investors to take

someone else's property and all of its equity over a debt that often originates from an accident or oversight." *Id.* at 933.

92. Professor Kahrl finds that Illinois's law is one of the nation's worst. He reports, "Tax lien investors not only worked to defend existing laws. In some states, they helped to write the very laws they would later profit from. In 1951 attorneys and lobbyists for professional tax buyers helped draft a bill to overhaul Illinois's tax delinquency sales law. The 1951 Illinois Revenue Act removed many of the legal hurdles tax buyers had to complete before being granted a tax deed and, along with it, vastly narrowed the range of legal options a tax delinquent property owner could employ in preventing loss of title. . . . The tax delinquency sales reforms unleashed a wave of predatory tax buying, often targeted at low-income, disproportionately minority homeowners, across the state." *Id.* at 920.

93. Indeed, the Illinois General Assembly has known this for decades. In the 1970s, a Legislative Investigative Commission was empaneled "in response to media allegations that the Illinois law concerning the sale of real property for delinquent taxes is unnecessarily harsh, and that this law allows some property owners to be unjustly victimized by professional tax purchasers." The Commission noted Illinois's delinquent tax law was "one of the toughest in the nation." The report acknowledged the statutes are "extremely harsh" and "oppressive." The Commission recommended the law "could be revised so as to produce even

better collection results than it does without the threat of total forfeiture of property," in particular, to create an auction system that returned the surplus value beyond the back taxes to the property owner. Such a recommendation would "simply eliminate the possibility of a tax buyer reaping an unearned windfall at the expense of those who can least afford it." Illinois Legislative Investigating Commission, *Annual Report of 1976*, at 22-24.[5] That recommendation was ignored.

94.    Institutionalized value theft preys upon the elderly in particular. A 2012 report from the National Consumer Law Center notes, "Homeowners most at risk are those who have fallen into default because they are incapable of handling their financial affairs, such as individuals suffering from Alzheimers, dementia, or other cognitive disorders." *The Other Foreclosure Crisis*, Nat. Consumer Law Center (July 2012).[6]

95.    Institutionalized value theft also disproportionately affects communities of color. An article from the Center for Community Progress notes, "In many communities, delinquent property tax enforcement systems also unfairly burden communities of color. In Baltimore, investigative reporters recently found that properties in the city's majority-Black census tracts have tax liens that are sold at much higher rates than minority-Black census tracts. In Washington, DC,

---

[5] https://www.ojp.gov/pdffiles1/Digitization/39864NCJRS.pdf

[6] https://www.nclc.org/wp-content/uploads/2022/09/tax-lien-sales-report.pdf

investigative reporters found that Black homeowners disproportionately lost their homes to tax foreclosure and researchers have found that tax foreclosures can contribute to gentrification by displacing homeowners of color." Libby Benton, *Delinquent Property Tax Enforcement Could Be the Missing Piece in Fighting Vacant Properties*, Center for Community Progress (Feb. 21, 2023).[7]

96.     Bloomberg reports similarly that "Generations of Black Americans lost their land to tax liens." Margaret Newkirk, Bloomberg (June 29, 2022).[8] In an earlier article, Bloomberg reported, "For decades, racist property assessments and predatory tax-debt sales went hand-in-hand in Chicago. The system came to be known as the 'Black Tax.'" Kriston Capps, *How the 'Black Tax' Destroyed African-American Homeownership in Chicago*, Bloomberg (June 11, 2015).[9] Upon information and belief, the same could be said in other parts of Illinois, like East Saint Louis.

97.     "This is a predatory enterprise that's being conducted by the state," [Professor Andrew] Kahrl says in an interview [with Bloomberg]. "Quite literally, Cook County is facilitating and helping to manage these predatory tax buyers who are preying on their own citizens. [The government is] not just

---

[7]     https://communityprogress.org/blog/delinquent-property-tax-enforcement-could-be-the-missing-piece-in-fighting-vacant-properties/

[8]     https://www.bloomberg.com/news/features/2022-06-29/tax-liens-cost-generations-of-black-americans-their-land

[9]     https://www.bloomberg.com/news/articles/2015-06-11/how-predatory-tax-lien-sales-destroyed-homeownership-for-african-americans-in-chicago

complicit—they're cogs in this industry, key players." *Id.* The same is true of every county in Illinois, because every county follows the same statutory scheme as Cook County.

98. Indeed, some brave officials inside the government have recognized its role in facilitating this predatory system. Maria Pappas, the Cook County Treasurer, issued a report in 2022 entitled, "How wealthy investors are making millions exploiting Illinois' property tax law: Their profits come at the expense of Black and Latino communities."[10]

99. Another academic paper shows that the Illinois statutory scheme is an outlier among other governments, less flexible and forgiving than those of other jurisdictions. Max Schmidt, *Selling Distress: How the Tax Foreclosure System Exacerbates Disinvestment in Cook County Communities*, Center for Municipal Finance (September 2022).[11]

100. Finally, upon information and belief, counties have continued executing tax deeds in the wake of *Tyler*. The State of Illinois has not changed its statutes in the wake of *Tyler*. Any tax deed foreclosure that stole property value after May 25, 2023, the date that *Tyler* was issued, demonstrates utter and reckless disregard for the constitutional rights of persons in the Plaintiff class.

---

[10] https://dig.abclocal.go.com/wls/documents/2022/101922-wls-sie-study-doc.pdf

[11] https://harris.uchicago.edu/files/cmf-scav-sale-pt-2-9_6_22.pdf

# CLAIMS

### Count I: The Defendant Class had an established policy and practice of taking property without just compensation in violation of the U.S. Constitution.

101.  The Fifth Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment, forbids counties to take property without just compensation. As the Supreme Court held in *Tyler*, a taxing authority effects an uncompensated (and thus unconstitutional) taking when, it keeps the surplus value after enforcing a tax lien.

102.  Here, the counties took property from the plaintiffs and the class members by retaining surplus value in connection with property taken to satisfy a tax lien.

103.  Under *Tyler*, the keeping of that excess surplus violates the Fifth Amendment's Takings Clause.

104.  The surplus property value taken from the Plaintiff Class and Subclasses must be returned to them by the Defendant Class.

105.  The emotional, psychological, and physical health effects of the loss of one's home are also damages that should be rectified.

### Count II: The Defendants and Defendant Class violated the takings clause rights of Plaintiffs and Plaintiff Class and Subclasses under the Illinois Constitution.

106.  The Illinois State Constitution provides: "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such

compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I, § 15.

107.  By its express language, the provision creates a cause of action for its violation. *Hoekstra v. Cty. of Kankakee*, 48 Ill. App. 3d 1059, 1061 (1977).

108.  For a taking of property (as opposed to damage to property), a plaintiff's "claim is analyzed under the same standard employed under the federal constitution." *Hampton v. Metro. Water Reclamation Dist.*, 2016 IL 119861, P16 (relying on *Int'l College of Surgeons v. City of Chicago*, 153 F.3d 356, 363 (7th Cir. 1998)).

109.  Because there has been a taking here under the federal constitution, per *Tyler*, the application of the same standard inevitably leads to the conclusion that there was a taking under the state constitution as well.

### Count III: The Defendants and Defendant Class levied excessive fines on Plaintiffs and the Plaintiff Class and Subclasses.

110.  Counties are barred by the Eighth Amendment to the U.S. Constitution, as incorporated against them by the Fourteenth Amendment, from imposing excessive fines.

111.  The state's policy choice to take the surplus value from delinquent property taxpayers is, at least in part, a punitive policy designed to punish lawbreakers and to disincentivize others from lawbreaking.

112.  Excessive fines are disproportionate fines. *See Timbs v. Indiana*, 139 S. Ct. 682, 693 (2019).

113. "The amount of the fine must bear some relationship to the gravity of the offense that it is designed to punish." *Grashoff v. Adams*, 65 F.4th 910, 917 (7th Cir. 2023).

114. The Supreme Court, in its seminal modern case on excessive fines, considered an instance where a traveler attempted to board an international flight with $357,144, in violation of the federal law requiring reporting of any transportation of more than $10,000 outside the United States. *Id.* (discussing *United States v. Bajakajian*, 524 U.S. 321 (1998)). The Supreme Court found it an excessive fine to impose a forfeiture of the entire $357,144 that Mr. Bajakajian attempted to transport.

115. Here, the single offense of failure to pay property taxes, which may go as low as a few thousand dollars, results in a sanction equivalent to the entire fair market value of a property, which may reach millions of dollars. This is unconstitutionally disproportionate in violation of the Eighth Amendment's excessive-fines clause.

116. Top Metal Buyers was subject to an excessive fine when the county imposed a forfeiture double what it owed in unpaid taxes. Shelly Branson and Trenise Hill were forced to forfeit value at five times the cost of their unpaid taxes. Debra Mosley forfeited six times the cost of her unpaid taxes. Mark Harrison forfeited eight times the cost of his unpaid taxes. Don Gilliam and Shirley Ferrell forfeited over ten times the cost of their unpaid taxes.

117. The Plaintiffs represent the overall experience of the Plaintiff Class, that the county treasurers consistently imposed forfeitures far in excess of the underlying amounts involved in the illegal act.

***Count IV: The Defendants and Defendant Class committed
the tort of inverse condemnation against the Plaintiffs
and Plaintiff Class and Subclasses.***

118. "Inverse condemnation is a cause of action that allows a landowner to recover compensation for the taking of property interests in circumstances where the governmental entity involved has not initiated eminent domain proceedings." *Kaskaskia Land Co., LLC v. Vandalia Levee & Drainage Dist.*, 2019 IL App (5th) 180403, P22.

119. Inverse condemnation includes "a direct appropriation or ouster that would be compensable." *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, P51.

120. This is precisely what happened here: the Plaintiffs and Plaintiff Class and Subclasses owned each piece of property, the government took each piece of property, but the government did not take the property through eminent-domain proceedings. Instead, the county treasurer directly appropriated the property through a tax foreclosure and kept the surplus value above and beyond the taxes owed (or allowed the tax lien investor to keep the surplus value). This is classic inverse condemnation: taking property without going through eminent-domain proceedings and therefore without paying just compensation.

121.  When an inverse condemnation takes place, the government owes just compensation to the former property owner. Here, just compensation equals the difference between the taxes and the fair market value of the property. "Just compensation is the fair market value of the property at its highest and best use on the date the complaint is filed. Fair market value is the amount of money a willing buyer under ordinary circumstances would pay to a willing owner in a voluntary sale when neither party is under any obligation to buy or sell." *DOT v. Drury Displays, Inc.*, 327 Ill. App. 3d 881, 888 (5th Dist. 2002).

### Count V: The Plaintiffs and Plaintiff Class and Subclasses's money was subject to tortious conversion by the Defendants and the Defendant Class.

122.  "To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 229 Ill. 2d 104, 127 (2008).

123.  "Where money is the subject of the alleged conversion, the plaintiff must further demonstrate that the money is capable of being described" with specificity. *Fonda v. General Cas. Co.*, 279 Ill. App. 3d 894, 899 (1st Dist. 1996).

124.  The Plaintiffs and the Plaintiff Class and Subclasses have a right to the surplus value above the taxes and fees owed, per *Tyler*.

125.  That right is immediate, absolute, and unconditional.

126. The Plaintiffs and the Plaintiff Class and Subclasses are excused from the necessity of making a demand "where the defendant no longer possesses the chattel [because] the law will not require the doing of a useless act." *Monroe County Water Cooperative v. Waterloo*, 107 Ill. App. 3d 477, 481 (1982).

127. Here, the Defendants and Defendant Class executed the tax deeds, thus converting Plaintiffs' property, but then transferred the property to either the tax-lien holder or a buyer at auction; either way, the county no longer possesses the property. As a result, a demand would be futile because the Defendants no longer possess the property at issue (or the surplus value in the property).

128. If necessary, the Court could create a subclass of Plaintiffs specific to this claim to exclude those Plaintiffs whose land is still owned by the Defendants. *See* 735 ILCS 5/2-802(a).

129. The Defendants and Defendant Class wrongfully took the surplus value: it was an unconstitutional act, per *Tyler*.

130. The money that has been converted is capable of being described with specificity: the difference in each individual case between the fair market value of the property and the amount of taxes and fees owed on the property.

131. When a taking occurs, the government owes the property owner just compensation promptly, not years later. Here, the government is taking the property and has no intention of returning the funds, at the time of the taking or in the future. That is the act of conversion.

**132.** Therefore, all four elements are met: the Plaintiffs have a right to the specific funds, that right is immediate, the need to demand return of the funds is excused, and the taking of the funds was wrongful.

### Count VI: The Defendants and Defendant Class enjoy unjust enrichment from their theft of the surplus value.

**133.** "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989).

**134.** All of these elements are met in this instance. Regardless of whether the Defendants and Defendant Class retained the property, auctioned the property themselves, or sold the tax lien to third-party investors, they secured surplus value in their own accounts that they have unjustly retained, either as the real property itself or as the money from the sale proceeds.

**135.** The retention of the property or sale proceeds in excess of what a debtor owes is contrary to fundamental principles of equity and justice, as indicated by the fact that Illinois forbids banks to keep excess surplus from foreclosure sales and by the fact that the Bill of Rights forbids the keeping of excess surplus.

**136.** For those properties that the county retains, it is unjustly enriched by the retention of the surplus value, either on an ongoing basis or when it sells the

property. For those properties that the county tax deeds to a private investor, the county is unjustly enriched by realizing a higher price from the tax buyer because of the possibility of value theft.

### Count VII: The Defendants and Defendant Class have committed the tort of money had and received.

137. "A cause of action for money had and received is maintainable where defendant has received money that in equity and good conscience belongs to the plaintiff." *Bueker v. Madison Cnty.*, 2016 IL App (5th) 150282, P53.

138. Here, the Defendants received money (the surplus value) that in equity and good conscience belongs to the Plaintiffs.

139. Again, if necessary, the Court can certify a subclass of Plaintiffs specific to this claim for property owners whose properties were retained or sold at auction by the Defendants or the Defendant Class.

# PRAYER FOR RELIEF

Given the foregoing, Plaintiffs, on behalf of themselves and the Plaintiff Class and Subclasses, respectfully request that the Court:

140.  Certify the Plaintiff Class, designate the Plaintiffs as representatives of the Plaintiff Class, and appoint the undersigned as Class Counsel;

141.  Certify the Defendant Class, designate the Defendants as representatives of the Defendant Class, and appoint the counsel for Defendants as Class Counsel;

142.  Pursuant to the Declaratory Judgment Act (28 U.S.C. §2201 and Fed. R. Civ. Proc. 57), provide relief by declaring that the uncompensated seizure of surplus value in property pursuant to Illinois's statute governing property taxation is unlawful under the Fifth Amendment to the U.S. Constitution;

143.  Award Plaintiffs and the Plaintiff Class just compensation for the unconstitutional taking of their property, namely the difference between the back taxes and interest owed and the fair market value of their property at the time of the tax foreclosure deed's issuance, with interest;

144.  Award Plaintiffs and the Plaintiff Class economic damages for the torts committed against them, namely the difference between the taxes and fees owed and the fair market value of their properties;

145.  Award the equitable relief and restitution requested, such as the return of economic damages for unjust enrichment;

146. Award the Plaintiffs and Plaintiff Class nominal damages for the violation of their state and federal constitutional rights;

147. award Plaintiffs and Plaintiff Class prejudgment and post-judgment interest, as permitted by law;

148. Award the Plaintiffs and the Plaintiff Class reasonable attorney's fees and costs, as provided by law;

149. Grant the Plaintiffs and the Plaintiff Class such other relief as is just and proper to recognize their claims and protect their rights to just compensation and appropriate damages.

## JURY DEMAND

Plaintiffs demand a jury for the resolution at trial of all issues so triable.

Respectfully submitted,

/s/ DANIEL R. SUHR

Daniel R. Suhr, WI #1056658
*Admitted to the Southern District of Illinois*
747 N. LaSalle St., Suite 210
Chicago, IL 60654
414.588.1658
danielsuhr@gmail.com

Christopher E. Mills
*(pro hac vice application forthcoming)*
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law