## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**Top Metal Buyers Inc., Shelly Branson**, **Debra Mosby**, **Jesse Beechler**, **Mark Harrison**, **Don Gilliam**, **Shirley Ferrell**, **Trenise Hill**, **Aaron Lindquist**, **Doshimae Johnson**, **Laurie Markley, Sydney Osborne**, and **Scott Karfs**, *on behalf of themselves and all others similarly situated*,

*Plaintiffs,*

v.

**Andrew Lopinot**, in his official capacity as treasurer of Saint Clair County; **Saint Clair County**, an Illinois political subdivision unit of government; **Joe Aiello**, in his official capacity as treasurer of Sangamon County; **Sangamon County**, an Illinois political subdivision unit of government; **Kelly Vincent**, in her official capacity as treasurer of Henry County; **Henry County**, an Illinois political subdivision unit of government; **Angela G. Graves**, in her official capacity as treasurer of McDonough County; **McDonough County**, an Illinois political subdivision unit of government; **Chris Slusser**, in his official capacity as treasurer of Madison County; **Madison County**, an Illinois political subdivision unit of government; *on behalf of themselves and all others similarly situated*; and **David Harris**, in his official capacity as director of the Illinois Department of Revenue,

*Defendants.*

Case Number: 3:24-cv-01073-NJR

## FIRST AMENDED COMPLAINT

1. The Fifth Amendment to the U.S. Constitution, incorporated against the States through the Fourteenth Amendment, prohibits the government from taking private property without paying just compensation to the property's owner.

2. For decades, the counties of Illinois have violated this prohibition.

3. The violation proceeds as follows. First, people or businesses fall behind on paying their property taxes—often, only a few thousand dollars in back taxes. In response, the county executes a tax deed taking the property, either into the hands of the county directly or to a tax-lien buyer who has purchased the back taxes on the property. Either way, that taking is for the entire value of the property, not only the value of the taxes owed. That surplus value—the difference between the taxes owed and the value of the property—is never returned to the former owner.

4. The U.S. Supreme Court recently held, unanimously, that this practice of seizing the surplus value in connection with property taken to satisfy a tax lien violates the Fifth Amendment's Takings Clause. *Tyler v. Hennepin County*, 598 U.S. 631 (2023). More particularly, though the taking of the property to satisfy delinquent taxes is itself legal, the failure to provide just compensation for the surplus value beyond the delinquent taxes is unconstitutional.

5. The victims of that policy are spread across Illinois's 102 counties, though they are most often poor, elderly, and vulnerable. Stealing the surplus value from these individuals is not just unconstitutional, it is unconscionable.

6. This lawsuit seeks redress for these unconstitutional, uncompensated takings. More precisely, this suit seeks relief on behalf of a class of all victims of the counties' property value theft. And it seeks this relief against a class consisting of every Illinois county.

7. The class-action mechanism provides a clean, efficient vehicle for judicial resolution of the thousands of individual claims that would otherwise clog the courts.

8. It is time to end the practice of institutionalized property-value theft and to justly compensate thousands of Illinoisans who were victims of this practice.

## PARTIES – PLAINTIFFS

9. Top Metal Buyers Inc. is an Illinois corporation headquartered in East Saint Louis, Illinois.

10. Shelly Branson is a natural person resident in Cahokia Heights, Illinois.

11. Debra Mosby is a natural person resident in Swansea, Illinois.

12. Jesse Beechler is a natural person resident in Springfield, Illinois.

13. Mark Harrison is a natural person resident in Springfield, Illinois.

14. Don J. Gillam is a natural person resident in East Carondelet, Illinois.

15. Shirley Ferrell is a natural person resident in East Saint Louis, Illinois.

16. Trenise Hill is a natural person resident in Cahokia, Illinois.

17.     Aaron Lindquist is a natural person resident in Colona, Illinois.

18.     Domishae Johnson is a natural person resident in Cahokia, Illinois.

19.     Laurie Markley is a natural person resident in Quincy, Illinois.

20.     Sydney Osborne is a natural person resident in Edwardsville, Illinois.

21.     Scott Karfs is a natural person resident in Belleville, Illinois.

22.     Plaintiffs, and all others similarly situated, were victims of institutionalized
theft by their county government thanks to Illinois's property tax statutes.

## PARTIES – DEFENDANTS

23.     Andrew Lopinot is the duly elected treasurer of Saint Clair County, Illinois.
As such, he is responsible for administering the property tax statutes for Saint Clair
County. *See* 35 ILCS 200/Art. 21. He issues the tax foreclosure deed taking a prop-
erty when a property's redemption period expires. He is sued in his official capacity
as an agent of Saint Clair County.

24.     Mr. Lopinot is president of the Illinois County Treasurers Association, the
statewide trade association for county treasurers.

25.     Saint Clair County, Illinois, is the municipal government responsible for
Saint Clair County, which covers East Saint Louis and its environs. It is the em-
ployer of Mr. Lopinot and others who administer its tax scheme.

26.     Joe Aiello is the duly elected treasurer of Sangamon County, Illinois. As such,
he is responsible for administering the property tax statutes for Sangamon County.
*See* 35 ILCS 200/Art. 21. He issues the tax foreclosure deed when a property's

redemption period expires. He is sued in his official capacity as an agent of Sanga-mon County.

27.      Sangamon County, Illinois, is the municipal government responsible for San-gamon County, which covers the state capital city of Springfield and its environs. It is the employer of Mr. Aiello and other employees who administer its tax scheme.

28.      Kelly Vincent is the duly elected treasurer of Henry County, Illinois. As such, she is responsible for administering the property tax statutes for Henry County. *See* 35 ILCS 200/Art. 21. She issues the tax foreclosure deed when a property's redemption period expires. She is sued in her official capacity as an agent of Sanga-mon County.

29.      Henry County, Illinois, is the municipal government responsible for Henry County. It is the employer of Ms. Vincent and other employees who administer its tax scheme.

30.      Angela G. Graves is the duly elected treasurer of McDonough County, Illi-nois. As such, she is responsible for administering the property tax statutes for McDonough County. *See* 35 ILCS 200/Art. 21. She issues the tax foreclosure deed when a property's redemption period expires. She is sued in her official capacity as an agent of McDonough County.

31.      McDonough County, Illinois, is the municipal government responsible for McDonough County. It is the employer of Ms. Graves and other employees who administer its tax scheme.

32.    Chris Slusser is the duly elected treasurer of Madison County, Illinois. As such, he is responsible for administering the property tax statutes for Madison County. *See* 35 ILCS 200/Art. 21. He issues the tax foreclosure deed when a property's redemption period expires. He is sued in his official capacity as an agent of Madison County.

33.    Madison County, Illinois, is the municipal government responsible for Madison County. It is the employer of Mr. Slusser and other employees who administer its tax scheme.

34.    Acting under color of state law and pursuant to policy choices made while implementing Illinois statutes 35 ILCS 200/21-1 et. seq., the Defendants violated the rights of Plaintiffs and all others similarly situated (the plaintiff class) by stealing the value in their property over and above the amounts legally owed for back property taxes.

35.    Mr. Harris is the director of the Illinois Department of Revenue. Though the Department does not directly administer the property tax system, the Department is responsible to, in its own words, "provide technical assistance and training to local officials;" "maintain taxing district maps;" "public assessment information and appraisal and assessment manuals;" and "award performance bonuses and stipends to assessment officials." The Department publishes "The Illinois Property Tax System: A general guide to the local property tax cycle." (IL St. Tax. Rep. (CCH) P 402-782).

## JURISDICTION & VENUE

36.      Jurisdiction exists under 28 U.S.C. § 1331 because the Plaintiffs and the proposed Plaintiff Class are individual persons (and their estates and heirs) and entities (such as limited liability companies or corporations) bringing claims under the U.S. Constitution for violations of their civil rights by a local government. *See* 42 U.S.C. § 1983.

37.      Jurisdiction for the declaratory relief is further appropriate under 28 U.S.C. § 2201(a).

38.      Jurisdiction over the pendent or supplemental state law claims is appropriate under 28 U.S.C. § 1367.

39.      Venue is appropriate in the Southern District of Illinois under 28 U.S.C. §1391(b)(1) & (2) because several Plaintiffs are residents of the Southern District of Illinois, the properties they formerly owned are in the Southern District of Illinois, the first named Defendant County and its officials are in the Southern District of Illinois, and the lead named defendant (Mr. Lopinot), who is the president of the Illinois County Treasurers Association, is in the Southern District of Illinois.

## FACTS

40.      "Many procedures are available to an Illinois county collector to secure payment of delinquent property taxes." *Phoenix Bond & Indem. Co. v. Pappas*, 309 Ill. App. 3d 779, 781, 723 N.E.2d 280, 281- 282 (2000).

41.    "If a property owner or other interested party fails to pay his real estate taxes, the Property Tax Code provides Illinois counties with several procedures for satisfying the lien of real estate taxes. . . . The Code also authorizes counties to seek recoveries from property owners based on personal liability for unpaid taxes." Illinois Real Estate Taxation 5.19 (1997).

42.    In other words, "Tax sales <u>are one means</u> by which the county enforces the collection of property taxes." Ill. Dep't of Revenue, *The Illinois Property Tax System*, at 25 (2014) (underline added). The other primary means by which counties may collect property taxes are lawsuits against the individual property owner. 35 ILCS 200/21-440 permits a county to "institute a civil action in the name of the People of the State of Illinois in the circuit court for the whole amount due for taxes and special assessments on the delinquent or forfeited property." *Accord* 35 ILCS 200/9-175 ("each owner is liable jointly and severally in any action under Section 21-440 for all taxes of that year."). "In recent years, the Cook County State's Attorney has sought to recover unpaid taxes through actions under §21-440 more often than in the past." Illinois Real Estate Taxation 5.48 (1997).

43.    However, the Defendant Counties (and all counties in the Defendant Class described below) have made the policy choice to use the other means permitted by the statute to recover the taxes, namely *in rem* actions. Illinois law permits counties, which collect property taxes, to sell property-tax liens to third-party investors, who then charge usurious rates of interest through a redemption period (usually

30 months), during which the property owner can pay the back taxes with fees and interest. If the property owner fails to do so, the lien-holder can file for a tax fore-closure on the home.

44.   Alternatively, "the state's attorney, as representative of all taxing bodies in the county, has the authority to compromise and settle the amount due on a re-demption." *In re Application of County Collector for Delinquent Taxes*, 155 Ill.2d 520, 617 N.E.2d 1192, 187 Ill.Dec. 471 (1993).

45.   If no one buys the taxes at a tax sale, "the lien of the taxes remains in the favor of the county, and that the forfeiture may be redeemed from the county at a penalty rate of 12 percent per year or any part thereof. There is no time limit within which a forfeiture must be redeemed. If a forfeiture remains unpaid, however, it may trigger some other tax enforcement procedure under the Property Tax Code, such as a forfeiture sale, a scavenger sale, a tax foreclosure sale, or a special tax sale." Illinois Real Estate Taxation 5.32 (1997). "Section 21-90 of the Code does authorize the county, in the discretion of the county board, to make 'no cash' bids at the annual tax sale, as trustee for all taxing districts, but only on parcels having delinquencies for two or more years." *Id.* at 5.28. Further, "Under Code §21-90, a county, in the discretion of the county board, may apply to the county clerk to purchase forfeitures but only on parcels having forfeitures for two or more years." Having done so, "Whenever taxes have been forfeited for two or more years, the

county may, in its discretion, commence tax foreclosure proceedings pursuant to §21-75 of the Property Tax Code." *Id.* at 5.46.

46.     A taking occurs when the County issues a tax deed transferring the entire property from the taxpayer to the lienholder or other purchaser (including sometimes the county itself). The issuance of a foreclosure judgment does not trigger the taking, and the Plaintiffs do not challenge the foreclosure judgments as to their property. Their claim is that—after the foreclosure judgment was entered—the treasurer issued a tax deed taking their property without furnishing them just compensation for the surplus value of their property. *See generally Knick v. Twp. of Scott*, 588 U.S. 180 (2019) (takings claim accrues at time of taking).

47.     Joseph E. Meyer & Associates is "Delinquent Tax Agent for County Boards in 96 of 102 counties in Illinois." According to Attorney Meyer's website, this includes all of Defendant Counties. Basically, his law firm and company provide back-end administrative services for counties to manage their tax-delinquent properties.

48.     In a presentation, Joseph E. Meyer & Associates emphasized that the calculation under *Tyler* is tied to "value at the time of taking, when the tax deed is recorded." He continued, "For Trustee Tax Deeds, applies to taxing district or land bank purchases. . . For Private Tax Buyer Tax Deeds, applies to these as well."

49.     The forecloser can either keep the property or sell it; either way, any value over and above the back taxes goes to the forecloser, not the former owner. *See 35 ILCS 200/21-200 et seq.*

50.     This is what happened to Top Metal Buyers, Inc. TMB formerly owned a property located at 1101 Cleveland Ave., East Saint Louis, IL 62201. TMB owed $44,089.58 on the property. The fair market value of the property, however, was over twice that: $102,279.[1] When the treasurer of Saint Clair County issued a tax deed and took the property, TMB lost over $55,000 in surplus value.

51.     This is also what happened to Shelly Branson. Mr. Branson formerly owned a single-family home at 221 Pittsburg Dr., East Saint Louis, IL 62203. He fell behind on paying the property taxes in the wake of his wife Toni's death several years ago. Mr. Branson owed $14,145 on the property. The fair market value of the property, however, was five times that--$76,756. When the treasurer of Saint Clair County issued a tax deed and took the property, Mr. Branson lost $60,000 in surplus value.

52.     Debra Mosby has a similar story. She formerly owned her home at 5705 North Park Dr., East Saint Louis, IL 62204. She owed $14,812.87 on the property. Saint Clair County's treasurer took the property through a tax deed, costing her almost $30,000 in stolen value, as the fair market value was $53,607.

53.     Jesse Beechler formerly owned the house at 2327 S. 15th St., Springfield, IL 62703. He owed $6,808.11 in taxes and fees on the property. The treasurer of

---

[1] All estimates of fair market value for these properties are taken from a national property valuation website like Zillow or Redfin.

Sangamon County took the property and sold it for $57,500, costing Mr. Beechler
$50,000 in stolen value. (The fair market value was estimated at $56,700).

54.     Mark Harrison formerly owned the home at 2913 S. 12th St., Springfield IL
62703. He owed $5,681.90 on the property. Its fair market value was $60,737.
When Sangamon County issued the tax deed taking the property, he took $55,000
in value.

55.     Don Gilliam formerly owned the home at 118 Front St., East Carondelet, IL
62240. He owed $10,178.20 for the property. Its fair market value was $112,700.
When Saint Clair County executed the tax deed, Mr. Gilliam lost over $100,000 in
value.

56.     Shirley Ferrell formerly owned her home at 8512 Church Lane, East Saint
Louis, IL 62203. She thought her property taxes were being taken out with her
mortgage payments. Because the taxes were unpaid, they were sold to a tax buyer.
She owed $7,320.13 for redemption, but the fair market value of the property was
$84,708. Eventually Saint Clair County issued a tax deed, and she lost over $75,000
in value.

57.     Trenise Hill formerly owned the home at 808 Otto Street, Cahokia, IL 62206.
She owed $8,964.27 for redemption, but the fair market value of the property was
$58,200. Eventually the Saint Clair Treasurer issued a tax deed, and she lost almost
$50,000 in value.

58.    Aaron Lindquist formerly owned the commercial property at 6273 Dayton Corner A St. Colona, IL 61241 in Henry County. The tax redemption cost was $82,981.30 when the property was taken. Yet its fair market value is $249,792. The lot was zoned as Improved Commercial. It was a commercial lot on 30 acres and home to Aaron's Affordable Towing, his small business.

59.    Domishae Johnson formerly owned the home at 708 St. Barbara Lane Cahokia, IL in St. Clair County. The redemption cost at the time of the taking was $12,635, but the fair market value was $56,400.

60.    Laurie Markley formerly owned five residential properties in McDonough County: 924 N Rile St, Bushnell, IL 61422; 431 W Main St., Bushnell, IL 61422; 153 W Davis St., Bushnell, IL 61422; 288 S Crafford, Bushnell, IL 61422; and 250 Grant Street, Bushnell, IL 61422. Upon information and belief, the fair market value of each property exceeded the tax redemption at the time of the taking.

61.    Sydney Osborne formerly owned the residential property at 408 Princeton Avenue in Edwardsville, Illinois, in Madison County. The cost of the tax redemption was $8,210.79. Yet the property sold for $187,000 in April 2023, meaning she lost almost $180,000 in value. She found the letter on her door for eviction the day she came home after having a liver transplant.

62.    Scott Karfs formerly owned the home at 1001 Southgate Drive, Belleville, IL 62223 in St. Clair County. The tax redemption value was $11,545.77, but the property's fair market value was $153,400. The home originally belonged to his parents.

When they passed away, the property went to he and his brother, who did not
realize that taxes were accruing. His brother was serving in Kuwait and was deal-
ing with mental illness at the same time he was taking care of financial matters for
their mom. The day his brother got the letter saying they were going to take the
house, he hung himself.

63.     The stories of these plaintiffs illustrate the harsh reality of Illinois's property
tax system. For decades, the State and its counties have conspired to knowingly
and unconstitutionally steal value, often a lifetime of savings, from homeowners
and small businesses of limited means to boost their own bank accounts.

64.     These were not one-off events. They are typical of a systematic, institution-
alized, multi-decade practice and policy undertaken pursuant to state law to profit
from property owners beyond the taxes and fees those property owners owed.

65.     The Illinois Property Tax Code permits this systemic abuse, but it does not
require it.

66.     The Defendant Counties and Defendant Class make a policy choice to use
tax sales because they are easy and convenient and get the taxing authority its
money quickly while making someone else (the tax buyer) do the hard work of
trying to collect from the delinquent taxpayer. Tax buyers are happy to take this
bargain because it enables the tax buyers to obtain the entire property, which could
be (and often is) worth several multiples of what he originally paid for the taxes.

67.    The statute relies on the County Treasurer, who issues the judgment book, auctions the liens, collects the fees, and administers the indemnity fund. The Treasurer also has a role, alongside the County Clerk, in issuing the tax deed.

68.    That act—the issuance of the tax deed transferring ownership without any return of surplus value—constitutes a taking of property that triggers the Fifth Amendment's Takings Clause. In other words, the tax deed itself is legitimate and Plaintiffs do not challenge the judgment or deed or ultimate foreclosure on their property. Instead, they challenge *only* the failure to provide just compensation for the taken property—*i.e.*, the failure to pay them the surplus value of the home beyond what they owed in taxes, interest, and fees.

69.    The Defendant Counties and Defendant Class also make a policy choice, when transferring the property, not to condition the transfer on return of the surplus value to the property owner.

70.    "[T]he [county tax] collector is not confined to those actions specifically detailed in the Property Tax Code. When the General Assembly conferred on county collectors the power to conduct tax sales, it also conferred, by implication, the authority to do all that is reasonably necessary to execute that power. . . . County collectors are permitted to exercise discretion to accomplish in detail what is legislatively authorized in general terms." *Phoenix Bond & Indem. Co. v. Pappas*, 194 Ill. 2d 99, 105 (2000). *Accord Lake Co. Bd. of Rev. v. Prop. Tax App. Bd.*, 119 Ill. 2d 419, 519 N.E. 2d 459 (1988).

71.     In *Phoenix Bond*, the county treasurer adopted a policy that declined to offer properties when identical bids were submitted in spite of the fact that the statute contained mandatory "shall sell" language. The Illinois Supreme Court agreed with the treasurer that her policy—a gloss on top of the statute—was a reasonable exercise of her discretion.

72.     Just as the treasurer in that case used her discretion to add a policy that protected the county's interest in a competitive auction, the treasurers here could have adopted policies that ensure their residents obtain just compensation from tax buyers who foreclose. But they have not adopted any such policies—before or after *Tyler*.

73.     In many instances, the county government retains the tax lien and directly forecloses, retaining the surplus value for itself or selling the entire property to a buyer at a scavenger sale. Sometimes the county executes the tax deed, sells the property, and keeps the profits; other times the county retains the title to the property. Either way, the county retains the surplus value over and above the back taxes and interest.

74.     Counties make more money than they otherwise would by selling liens because purchasers get to keep the surplus over and above the back taxes in the event they foreclose on the property. In other words, even in those instances where the county does not retain the surplus value directly, the county profits from its

16

unconstitutional policy because it gets a higher price for liens at auction than if, as the Constitution requires, the third-party investor could not keep the surplus value.

75.    The theft of surplus value is only possible when the government authorizes it through a property-tax deed.

76.    Private entities are not so authorized. When a bank forecloses on a property after a debtor defaults on a mortgage, the bank may take the property but it must return the surplus equity in the property above the mortgage to the debtor.

77.    By contrast, when a county issues a tax deed taking a property, the surplus value in the property above the back taxes is not returned.

78.    Most states require county and municipal governments to return the surplus value to the owner; Illinois is one of the few states that authorizes this theft of surplus value.

79.    The Defendants' answer to Plaintiffs' problem is no solution at all. The State mandates that on every tax-lien sale, a fee is paid into an indemnity fund. 35 ILCS 200/21-295. That fee is currently capped at $20 in all counties under three million inhabitants, and $80 in all counties with more than three million inhabitants. *Id.*

80.    First off, many victims of takings cannot receive just compensation from an indemnity fund. The maximum recovery from the indemnity fund for a 1-4 unit residential property is $99,000. *Id.* In a state where the average home is worth just

shy of $250,000,[2] many property owners are not eligible to reclaim the entire home-equity surplus. Plaintiffs Don Gilliam and Sydney Osborne, for instance, lost over $100,000 in the difference between their property's fair market value and their redemption amount, so they could not achieve a complete recovery from the indemnity fund.

81.    Moreover, the indemnity fund statute makes its funds generally available only to residential properties with four or fewer units (*i.e.*, individual homes, duplexes, triplexes, and quadraplexes). 35 ILCS 200/21-305(a)(1). That means apartment buildings and commercial properties such as that owned by Top Metal Buyers Inc. and Aaron Lindquist are excluded.

82.    Even for residential properties of under five units with lost value of under $99,000, the indemnity fund is constitutionally insufficient for several reasons: the funds are underfunded and many claims are denied.

83.    The indemnity funds are statutorily limited in size, and counties have discretion, and indeed an incentive, to underfund them. 35 ILCS 200/21-300(a) provides: "The county board in each county shall determine the amount of the fund to be maintained in that county, which amount shall not be less than 0.03% of the total assessed valuation, as equalized by the [Illinois] Department [of Revenue], of property within the County, or $50,000, whichever is greater, and shall not be

---

[2] https://www.zillow.com/home-values/21/il/

greater than $1,000,000 in counties with less than 3,000,000 inhabitants, and not greater than $2,000,000 in counties with 3,000,000 or more inhabitants. Any moneys accumulated by the County Treasurer in excess of the amount so established, as trustee of the fund, shall be paid by him or her annually to the general fund of the County."

84.    In other words, the Defendant Counties and Defendant Class have policy discretion concerning what balance to maintain in the funds, and a financial incentive to transfer as much as possible out of the indemnity funds and into the general fund. This further exacerbates underfunding of the indemnity funds.

85.    This leaves county indemnity funds woefully, structurally underfunded. The indemnity funds thus do not have sufficient funds to promptly provide the just compensation to which the Plaintiff Class is entitled.

86.    "Because there are sometimes insufficient funds available to satisfy indemnity fund judgments, there have occasionally been long delays between the time of judgment and the payment of the award to the successful indemnity petitioner." Illinois Real Estate Taxation 5.122 (1997).

87.    For example, the indemnity fund in the largest county in Illinois—Cook County—is currently $22 million in debt and has an eight-year backlog in making payments. Sidnee King, *Tax sale process hits Black homeowners hardest*, Illinois

Answers Project (Nov. 17, 2022).[3] A study by the Pacific Legal Foundation, a think tank and legal advocacy organization for homeowners, indicates that nearly 1200 homeowners in Cook County had $136 million in home value stolen from them from 2014-2021.[4] Yet the fund had only 230 claims pending against it, indicating many homeowners are unaware of the fund or do not qualify for its coverage.

88.     Upon information and belief, other counties have similarly underfunded accounts compared to the potential demand on them.

89.     The same study by PLF looked at "home equity theft across the 11 most populous Illinois counties, [where] 3,539 homes were taken and sold from 2014 to 2021. On average, homeowners lost 85% of the value of their homes to private investors and the government."

90.     That same study found that lost home equity in Lake County was $39M, Kane, $34M, Winnebago, $33M, Madison, $25M, Sangamon, $19M, McHenry, $6.5M, Champaign, $6M. That is only for residential home equity: it does not count commercial properties. Yet in all these counties, the fund is capped at $1M by statute. So it is impossible for the counties to make the class whole from these funds. Defendant Sangamon County, for instance, would be $18M short on its obligation to homeowners alone, not counting commercial properties. Defendant Madison County would be $24M short.

---

[3] https://illinoisanswers.org/2022/11/17/tax-sale-process-hits-black-homeowners-hardest/

[4] https://homeequitytheft.org/illinois

91.    Moreover, the indemnity fund statutes do not give homeowners the same unqualified right to just compensation that the U.S. and Illinois Constitutions provide. To the contrary, the Illinois Code authorizes judges to deny just compensation in their "equitable discretion." Judges are to consider the "circumstances[,] include[ing] the mental, physical, and financial status of the person seeking indemnity; the person's comprehension of property taxes and the duty to pay them; and the person's diligence and credibility." *Colantuono v. Novak*, 2011 Ill. App. Unpub. LEXIS 1921, *9. Illinois judges often use this to deny indemnity fund awards, such as when a title company failed to pay the taxes on a residential property, *id.* at *11, or when the property owner failed to go to the post office to sign for certified mail. *Malmloff v. Kerr*, 227 Ill. 2d 118, 127 (2007). Even a church that thought it was relying on advice from an employee of the county assessor's office was denied relief from the indemnity fund. *Greater Pleasant Valley Church in Christ v. Pappas*, 975 N.E.2d 713, 716 (Ill. App. 1st Dist. 2012). The constitutional right to just compensation for a taking is absolute and attaches to every taking—regardless of how at fault or faultless the deprived owner. That is because the responsibility lies on the government to provide just compensation for the taking.

92.    To make matters worse, but the Illinois code authorizes judges to cite the underfunding of an indemnity fund as a reason to give a petitioner less than full just compensation, *Malmloff v. Kerr*, 227 Ill. 2d 118, 127 (2007), in violation of the U.S. and Illinois constitutions.

93.    Upon information and belief, counties do not provide notice to homeowners of the existence of the indemnity fund.

94.    In sum, then, the indemnity funds do not and cannot provide just compensation for these takings. For commercial properties like Lindquist's lot and Top Metal Buyers, they do not qualify. For properties like Gilliam and Osborne, they cannot possibly fully recover. And even for the others, the funds are massively underfunded compared to their potential liability, and this underfunding can be exacerbated by the county's policy choices. Moreover, the funds can only be claimed through a judge's equitable determination, and many judges decline to grant such claims. The Constitution demands more than this. This process is also markedly different from the one set forth in *Nelson v. New York*, 352 U.S. 103 (1956), where the former property owner was entitled to a statutory mechanism to promptly claim the entire surplus value. *Id.* at 110.

95.    After the Supreme Court's unanimous decision in *Tyler* condemning these practices, the Defendant Class should have refunded the surplus value that the counties stole from the Plaintiff Class. Upon information and belief, none has done so, thus continuing the violation of Plaintiffs' rights.

96.    Upon information and belief, the Defendant Class has continued its practice and policy, pursuant to an unchanged statute, of taking and retaining surplus value.

97.    At least some county officials have recognized the problems with their current policies denying surplus value to property owners. Defendant Madison

County's State's Attorney introduced a motion in a recent tax foreclosure proceeding out of concern that the County could be exposed to liability for an unconstitutional taking. The State's Attorney explained in his motion in the state court case: "The lack of profit from the taking does not absolve the County from liability. In *Tyler* the government kept a windfall; here the County may potentially take the windfall and give it away to a private tax buyer. That distinction does not diminish the prior owner's entitlement to just compensation. . . Even though the tax buyer purchased a tax lien certificate, it is the County Clerk that will extinguish the prior owner's title as the County Clerk issues the tax deed that divests title. . . . [T]he tax buyer here is asking the County to extinguish a property interest without accounting for equity. The tax buyer is attempting to effect an unconstitutional taking. Under *Tyler*, the soon-to-be-ex-owner is entitled to just compensation for his home equity. [Cite] *Tyler* requires that the County and the private tax buyer identify, isolate, and protect that equity. . . . [T]he involvement of private tax buyers does not rescue the county from its obligation to pay just compensation." *As-Is Properties v. Egelhodd*, Case No. 2023TX000061 (Ill. 3d Jud. Dist., *Motion* Nov. 9, 2023).

## PLAINTIFF CLASS

98.    A class action is the simple, efficient way to ensure that all Illinois homeowners and small businesses that have been victims of this theft receive just compensation for the gross violation of their constitutional and legal rights.

99.     To that end, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Class:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois; (2) their property was subject to a tax deed taking by a county; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

100.     Plaintiffs believe that the Class can be ascertained on a consistent, fair, all-properties basis in at least three different ways. *First*, the Class could be ascertained using commercially available data (like Zillow, Redfin, or Corelogic) that reflects the fair market value of each property, which can be shown through a straightforward expert witness report. *Second*, the Class could be ascertained using the assessed value of each property for tax purposes—a value the Counties themselves assign using their own valuation methods. *Third* and finally, the Court could certify a sub-class limited to plaintiffs whose properties were sold within one year of the taking for a price higher than the owners' back taxes, interest, in fees.

101.     Plaintiffs are aware of two similar actions in the Northern District of Illinois. *Sharritt et al. v. DuPage County, et al.*, No. 1:23-cv-15838, seeks to certify a plaintiff class on behalf of property owners with similar legal claims in DuPage County, Kane County, Lake County, Will County, Winnebago County, Boone County,

Carroll County and Peoria County. The plaintiffs' proposed class has not been certified yet. The parties are currently briefing on a motion to dismiss.

102.     Separately, *Bell v. Pappas*, No. 1:22-cv-07061, seeks to certify a plaintiff class on behalf of property owners with similar legal claims in Cook County. The case was filed in 2022, but had been stayed pending *Tyler*. With *Tyler* decided, active litigation has resumed. The class has not been certified yet.

103.     Therefore, in the alternative event that those plaintiff classes are certified before this plaintiff class here is certified, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Subclass:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois other than in Cook and/or DuPage, Kane, Lake, Will, Winnebago, Boone, Carroll, and Peoria counties; (2) their property was subject to a tax deed taking by a county; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

104.     The *Sharritt* and *Bell* cases currently focus on and represent homeowners, not commercial properties, though their proposed classes include all properties regardless of type in those counties. If the rulings in those cases differentiate between indemnity-eligible and non-eligible properties (see paragraphs 80-81 above), then Plaintiffs may modify this class definition to reflect their position as the only case with a commercial property class representative or a representative who lost more than $99,000.

105.    Excluded from the Class or Alternative Subclasses are: (i) any judge or magistrate presiding over this case and their family members and staff; and (ii) Plaintiffs' counsel. Plaintiffs reserve the right to modify the class definition as the case unfolds and further facts are discovered.

106.    Upon information and belief, the Plaintiff Class and Subclasses include thousands of people and companies whose homes or business properties were taken through a tax deed. Bringing such suits individually would clog Illinois courts, whereas a single class proceeding would result in an efficient adjudication, such that the requirement of numerosity is met. The information as to who belongs to the class can be discerned from data held by the Defendant Class and Subclasses members. Moreover, the present addresses of members of the Class and Subclasses can be ascertained from public records, and members of the Class and Subclasses can be reached by multiple methods of communication.

107.    There are questions of law and fact common to all members of the Class and Subclasses. All have been subject to the same process laid out by Illinois law and executed by all counties pursuant to these statutes.

108.    The questions of law are common across the Class and Subclasses:

- Does the Defendants' policy of executing a tax deed where surplus value was not returned to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of executing tax deeds and taking property without returning surplus value constitute a taking without just compensation under the Illinois Constitution?

26

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiffs without an eminent domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiffs have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiffs?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiffs?

109.    The questions of fact are also simple: Were the Class and Subclass members stripped of their property by a county tax deed? And did the fair market value of the property, as determined by a neutral third-party data provider, exceed the back taxes and interest owed on the property?

110.    Once the law and facts are resolved, the question is simply how to return to the Plaintiff Class or Subclasses the amount stolen from them by the Defendant Class of counties.

111.    The fair market value of each property can fairly be determined from commercially available data. The fair market value of each property can be calculated in a way that is simple, straightforward, and universally applicable to the entire Plaintiff Class and Subclasses. *See United States v. 50 Acres of Land*, 469 U.S. 24, 25-

26 (1986); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (fair market value is the appropriate standard to determine just compensation for a taking).

112.    As noted above, the class could also proceed in the alternative based on assessed value. In the further alternative, the class could proceed for a more limited number of properties with a close-in-time actual sale price.

113.    The claims are typical across the entire class: all members of the Plaintiff Class and Subclasses were the victims of the same property tax statutes administered by the counties in conformance with state law.

114.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. All Plaintiffs are members of the Class and certain plaintiffs are members of the various Subclasses. Plaintiffs have no interests adverse to the interests of the Class and Subclasses. Plaintiffs are committed to prosecuting this action and have retained competent, experienced counsel who have had substantial success prosecuting class action cases and claims based on constitutional law.

115.    Moreover, Plaintiffs have structured this case in a way that (1) reaches all counties in Illinois through the Defendant Class, (2) includes all plaintiffs whether homeowners or small businesses, (3) includes a demand for just compensation calculated based on fair market value, (4) includes a demand for additional damages beyond just compensation for the surplus value stolen, (5) addresses the statutory indemnity fund, and (6) covers all plaintiffs whether their property was sold or retained by the foreclaser.

116.    Questions of law or fact common to the Class and Subclasses predominate over questions affecting individual members of the class, as the only individualized question—the size of the surplus taken from any given class member—can be quickly and easily determined using commercially available data.

117.    Similarly, the Defendant Class's actions apply generally to the whole class, so final declaratory and damages relief is appropriate and indeed necessary to rectify the wrongs the counties have perpetrated on the class.

118.    A class action is the optimal vehicle to fairly and efficiently resolve the question of property value theft for its victims statewide. The alternative is thousands of individual lawsuits, which would clog the courts. Moreover, such lawsuits are unlikely to the extent that the Plaintiff Class and Subclasses are overwhelmingly composed of low-income and elderly residents and those for whom English is a second language, such that the class action is the optimal vehicle for achieving justice for the greatest number of persons. A class action ensures all victims of property theft are justly compensated without burdening the courts or Defendant units of government with numerous lawsuits.

## DEFENDANT CLASS

119.    It is further appropriate to certify a defendant class action. Defendant classes are most often used and most appropriate in cases against governmental units, such as this case where all counties acted within the same state statutory scheme (even

as they exercised discretion within that scheme). *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002).

120.    To that end, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, against the following class:

> All Illinois county governments and their elected treasurers who (1) make the policy choice to collect at least some delinquent property taxes through tax sales and (2) executed or aided in the execution of tax-deed foreclosures on properties where the fair market value of the property exceeded the amount of back taxes and interest owed on the property at the time of the foreclosure.

121.    All Illinois county governments are political subdivisions of the State subject to the Fifth Amendment to the U.S. Constitution via the Fourteenth Amendment. They are all also "persons" subject to 42 U.S.C. Section 1983, the civil rights statute.

122.    All Illinois county governments and their responsible officers (the treasurer) acted uniformly in the relevant respects in their administration of Illinois's property tax statute.

123.    There are 102 Illinois counties. Bringing all of them into an action with separate counsel would be utterly impractical and make case administration impossible. Resolving them through class-actions against individual counties could also create 102 separate cases and could create conflicting or differing resolutions, resulting in unfairness between county residents.

124.    Common questions of law and fact exist as to all counties: all counties acted pursuant to the same state statutes.

30

125.    The questions of law are common across the class:

- Does the Defendants' policy of executing a tax deed where surplus value was not returned to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of executing tax deeds and taking property without returning surplus value constitute a taking without just compensation under the Illinois Constitution?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiffs without an eminent-domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiffs have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiffs?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiffs?

126.    After a legal conclusion in this case is reached, each county can be contacted through its responsible officials to access the data necessary to determine the Plaintiff Class members in that county and that county's individual financial obligations to those Class members.

127.    Defendants are adequate Defendant Class representatives because their interests do not conflict with the interests of Defendant Class Members they represent. Each County retains and distributes surplus proceeds from property

foreclosed upon within that County. The distribution of the surplus proceeds re-
mains within each County and does not conflict with distribution within other
counties. Defendants share the same defenses regarding such distribution. Moreo-
ver, the treasurer of Saint Clair County is the president of the Illinois County
Treasurers Association, which makes him a natural representative for the class.
And Sangamon County is the home to the State Capitol, also a natural representa-
tive for the class.

## DAMAGE TO PLAINTIFF CLASS BEYOND THE STOLEN VALUE

128.    Home ownership is a core pillar of the American dream. Home ownership is
correlated with physical health, mental and emotional health, financial prosperity,
a secure retirement, and a solid family life. *See* Luke A. Munford, et al., *Is owning
your home good for your health? Evidence from exogenous variations in subsidies in Eng-
land*, 39 Economics and Human Biology 100903 (2020).

129.    When members of the Plaintiff Class lose their entire home value, they are
literally forced out on the streets with nothing. It is virtually impossible for them
to move into a new home when they have zero money for a down payment after all
their equity has been stolen by their government. They end up in apartments, on
the couches of friends and neighbors, or on the streets. Their children are forced to
move schools, and their entire lives are disrupted. The loss of a home to foreclosure
correlates to mental and emotional strain, a decline in physical health, a decline in
academic achievement for students in the home, and a multi-generational loss of

wealth. *See* Alexander C. Tsai, *Home foreclosure, health, and mental health: a systematic review of individual, aggregate, and contextual associations*, 10 PloS one e0123182 (April 7, 2015).

130.     Loss of a home is not just about its immediate effects: it is also about the loss of dignity. Homeownership is a mark of pride, of responsible membership in the community, of citizenship in a neighborhood, of stake in a place. It represents a tremendous blow to a person's standing in the community to be forced out on the street after a foreclosure. Gregory S. Alexander, *Property, Dignity, and Human Flourishing*, 104 Cornell L. Rev. 991 (2019).

131.     The same is true for those who lose commercial properties. An owner-occupied duplex, a family-run restaurant, or a small business already live on the narrowest of margins. The loss of all value in a commercial property can bankrupt a small business. The owner of that business has to lay off employees, cancel vendor contracts, and stop serving customers. An entire community is affected.

## UNCONSCIONABLE BEHAVIOR BY DEFENDANT CLASS

132.     The Defendant Class's cavalier attitude towards the constitutional rights and human dignity of the Plaintiff Class and Subclasses is outrageous, displaying a consistent indifference that shocks the conscience. For starters, one would think it obvious that intentional government-organized theft on a massive scale would be wrong, plain and simple. But numerous academic and advocacy reports made Illinois state and local governments aware that their policies were outrageous and

especially damaging to their most vulnerable populations: the elderly, communities of color, and those who speak English as a second language. Yet they chose to persist in these policies even knowing of their effects because they wanted the cash.

**133.** One of the nation's premier academic experts in this area finds "greed and cruel indifference to their victims" pervasive in the tax foreclosure industry. Andrew W. Kahrl, *Unconscionable: Tax Delinquency Sales as a form of dignity taking*, 92 Chicago-Kent L. Rev. 905, 932 (2017). As Professor Andrew Kahrl of the University of Virginia points out in an article for the Chicago-Kent Law Review, "Because minority neighborhoods have historically been subject to discriminatory overtaxation and lower property values as result of segregation and 'redlining,' African American homeowners have been and remain more vulnerable to predatory tax buying." He continues, "Tax buying has inflicted a significant, if underappreciated, economic toll on black America. It contributed, in no small measure, to the precipitous decline of black landownership over the second half of the twentieth century (from over 15 million acres in 1910 to 2.3 million acres in 1997), prevented African American communities from becoming partners in and beneficiaries of real estate development in some of America's most vibrant markets accelerated the deterioration of urban minority neighborhoods and stymied efforts at recovery, and exacerbated the racial wealth gap. It has also left deep emotional scars on victims, robbing them of their dignity in the course of taking—or threatening to take—their property."

34

134.    "To homeowners facing eviction, predatory tax buying was a cruel, vicious, indeed unconscionable, act." *Id.* at 923. He concludes, "It is unconscionable, but perhaps not surprising, that many states allow private investors to take someone else's property and all of its equity over a debt that often originates from an accident or oversight." *Id.* at 933.

135.    Professor Kahrl finds that Illinois's law is one of the nation's worst. He reports, "Tax lien investors not only worked to defend existing laws. In some states, they helped to write the very laws they would later profit from. In 1951 attorneys and lobbyists for professional tax buyers helped draft a bill to overhaul Illinois's tax delinquency sales law. The 1951 Illinois Revenue Act removed many of the legal hurdles tax buyers had to complete before being granted a tax deed and, along with it, vastly narrowed the range of legal options a tax delinquent property owner could employ in preventing loss of title. . . . The tax delinquency sales reforms unleashed a wave of predatory tax buying, often targeted at low-income, disproportionately minority homeowners, across the state." *Id.* at 920.

136.    Indeed, the Illinois General Assembly has known this for decades. In the 1970s, a Legislative Investigative Commission was empaneled "in response to media allegations that the Illinois law concerning the sale of real property for delinquent taxes is unnecessarily harsh, and that this law allows some property owners to be unjustly victimized by professional tax purchasers." The Commission noted Illinois's delinquent tax law was "one of the toughest in the nation." The report

acknowledged the statutes are "extremely harsh" and "oppressive." The Commission recommended the law "could be revised so as to produce even better collection results than it does without the threat of total forfeiture of property," in particular, to create an auction system that returned the surplus value beyond the back taxes to the property owner. Such a recommendation would "simply eliminate the possibility of a tax buyer reaping an unearned windfall at the expense of those who can least afford it." Illinois Legislative Investigating Commission, *Annual Report of 1976*, at 22-24.[5] That recommendation was ignored.

137.    Institutionalized value theft preys upon the elderly in particular. A 2012 report from the National Consumer Law Center notes, "Homeowners most at risk are those who have fallen into default because they are incapable of handling their financial affairs, such as individuals suffering from Alzheimers, dementia, or other cognitive disorders." *The Other Foreclosure Crisis*, Nat. Consumer Law Center (July 2012).[6]

138.    Institutionalized value theft also disproportionately affects communities of color. An article from the Center for Community Progress notes, "In many communities, delinquent property tax enforcement systems also unfairly burden communities of color. In Baltimore, investigative reporters recently found that properties in the city's majority-Black census tracts have tax liens that are sold at much

---

[5] https://www.ojp.gov/pdffiles1/Digitization/39864NCJRS.pdf

[6] https://www.nclc.org/wp-content/uploads/2022/09/tax-lien-sales-report.pdf

higher rates than minority-Black census tracts. In Washington, DC, investigative reporters found that Black homeowners disproportionately lost their homes to tax foreclosure and researchers have found that tax foreclosures can contribute to gentrification by displacing homeowners of color." Libby Benton, *Delinquent Property Tax Enforcement Could Be the Missing Piece in Fighting Vacant Properties*, Center for Community Progress (Feb. 21, 2023).[7]

139.    Bloomberg reports similarly that "Generations of Black Americans lost their land to tax liens." Margaret Newkirk, Bloomberg (June 29, 2022).[8] In an earlier article, Bloomberg reported, "For decades, racist property assessments and predatory tax-debt sales went hand-in-hand in Chicago. The system came to be known as the 'Black Tax.'" Kriston Capps, *How the 'Black Tax' Destroyed African-American Homeownership in Chicago*, Bloomberg (June 11, 2015).[9] Upon information and belief, the same could be said in other parts of Illinois, like East Saint Louis.

140.    "This is a predatory enterprise that's being conducted by the state," [Professor Andrew] Kahrl says in an interview [with Bloomberg]. "Quite literally, Cook County is facilitating and helping to manage these predatory tax buyers who are preying on their own citizens. [The government is] not just complicit—they're

---

[7]    https://communityprogress.org/blog/delinquent-property-tax-enforcement-could-be-the-missing-piece-in-fighting-vacant-properties/

[8]    https://www.bloomberg.com/news/features/2022-06-29/tax-liens-cost-generations-of-black-americans-their-land

[9]    https://www.bloomberg.com/news/articles/2015-06-11/how-predatory-tax-lien-sales-destroyed-homeownership-for-african-americans-in-chicago

cogs in this industry, key players." *Id.* The same is true of every county in Illinois, because every county follows the same statutory scheme as Cook County.

141.    Indeed, some brave officials inside the government have recognized its role in facilitating this predatory system. Maria Pappas, the Cook County Treasurer, issued a report in 2022 entitled, "How wealthy investors are making millions exploiting Illinois' property tax law: Their profits come at the expense of Black and Latino communities."[10]

142.    Another academic paper shows that the Illinois statutory scheme is an outlier among other governments, less flexible and forgiving than those of other jurisdictions. Max Schmidt, *Selling Distress: How the Tax Foreclosure System Exacerbates Disinvestment in Cook County Communities*, Center for Municipal Finance (September 2022).[11]

143.    Finally, upon information and belief, counties have continued executing tax deeds in the wake of *Tyler*. The State of Illinois has not changed its statutes in the wake of *Tyler*. Any tax deed foreclosure that stole property value after May 25, 2023, the date that *Tyler* was issued, demonstrates utter and reckless disregard for the constitutional rights of persons in the Plaintiff class.

---

[10] https://dig.abclocal.go.com/wls/documents/2022/101922-wls-sie-study-doc.pdf

[11] https://harris.uchicago.edu/files/cmf-scav-sale-pt-2-9_6_22.pdf

## CLAIMS

### Count I: The Defendant Class had an established policy and practice of taking property without just compensation in violation of the U.S. Constitution.

144.     The Fifth Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment, forbids counties to take property without just compensation. As the Supreme Court held in *Tyler*, a taxing authority effects an uncompensated (and thus unconstitutional) taking when, it keeps the surplus value after enforcing a tax lien.

145.     Here, the counties took property from the plaintiffs and the class members by retaining surplus value in connection with property taken to satisfy a tax lien.

146.     Under *Tyler*, the taking of that excess surplus violates the Fifth Amendment's Takings Clause.

147.     The surplus property value taken from the Plaintiff Class and Subclasses must be returned to them by the Defendant Class.

148.     The emotional, psychological, and physical health effects of the loss of one's home are also damages that should be rectified.

149.     That taking is a violation of constitutional rights subject to recompense under Section 1983.

150.     The counties had a policy choice: several procedures are available to recover delinquent property taxes. An *in personam* action against the property owner, for instance, does not result in the uncompensated taking of surplus value. Instead, the

Defendants made a policy choice to prioritize their convenience over the Plaintiffs' rights by using the tax sale mechanism, which does take their surplus value in violation of the Fifth Amendment.

151.    The Defendant Class counties are liable based on their policy choice to use tax sales and their issuance of the tax deed that constitutes the taking. Thus, the Plaintiffs only seek declaratory relief as to Mr. Harris, the state official, not damages relief. However, in the alternative, Plaintiffs claim that the indemnity fund is the exclusive remedy for recovery of surplus value by the Plaintiffs and Plaintiff Class, that certain Plaintiffs (Lindquist, Top Metal Buyers) and much of the Plaintiff Class are categorically excluded from that remedy, that other Plaintiffs (Gilliam and Osborne) and much of the Plaintiff Class are categorically excluded from complete just compensation, and therefore an exception to sovereign immunity is available for their takings claim.

### Count II: The Defendants and Defendant Class violated the takings clause rights of Plaintiffs and Plaintiff Class and Subclasses under the Illinois Constitution.

152.    The Illinois State Constitution provides: "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I, § 15.

153.    By its express language, the provision creates a cause of action for its violation. *Hoekstra v. Cty. of Kankakee*, 48 Ill. App. 3d 1059, 1061 (1977).

154.    For a taking of property (as opposed to damage to property), a plaintiff's "claim is analyzed under the same standard employed under the federal constitution." *Hampton v. Metro. Water Reclamation Dist.*, 2016 IL 119861, P16 (relying on *Int'l College of Surgeons v. City of Chicago*, 153 F.3d 356, 363 (7th Cir. 1998)).

155.    Because there has been a taking here under the federal constitution, per *Tyler*, the application of the same standard inevitably leads to the conclusion that there was a taking under the state constitution as well.

### Count III: The Defendants and Defendant Class levied excessive fines on Plaintiffs and the Plaintiff Class and Subclasses.

156.    Counties are barred by the Eighth Amendment to the U.S. Constitution, as incorporated against them by the Fourteenth Amendment, from imposing excessive fines.

157.    The state's policy choice to take the surplus value from delinquent property taxpayers is, at least in part, a punitive policy designed to punish lawbreakers and to disincentivize others from lawbreaking.

158.    Excessive fines are disproportionate fines. *See Timbs v. Indiana*, 139 S. Ct. 682, 693 (2019).

159.    "The amount of the fine must bear some relationship to the gravity of the offense that it is designed to punish." *Grashoff v. Adams*, 65 F.4th 910, 917 (7th Cir. 2023).

160.    The Supreme Court, in its seminal modern case on excessive fines, consid-ered an instance where a traveler attempted to board an international flight with $357,144, in violation of the federal law requiring reporting of any transportation of more than $10,000 outside the United States. *Id.* (discussing *United States v. Bajakajian*, 524 U.S. 321 (1998)). The Supreme Court found it an excessive fine to impose a forfeiture of the entire $357,144 that Mr. Bajakajian attempted to transport.

161.    Here, the single offense of failure to pay property taxes, which may go as low as a few thousand dollars, results in a sanction equivalent to the entire fair market value of a property, which may reach millions of dollars. This is unconstitutionally disproportionate in violation of the Eighth Amendment's excessive-fines clause.

162.    Top Metal Buyers was subject to an excessive fine when the county imposed a forfeiture double what it owed in unpaid taxes. Aaron Lindquist and Domishae Johnson were subject to an excessive fine triple the cost of the unpaid taxes. Shelly Branson and Trenise Hill were forced to forfeit value at five times the cost of their unpaid taxes. Debra Mosley forfeited six times the cost of her unpaid taxes. Mark Harrison forfeited eight times the cost of his unpaid taxes. Don Gilliam, Scott Karfs, and Shirley Ferrell forfeited over ten times the cost of their unpaid taxes.

163.    The Plaintiffs represent the overall experience of the Plaintiff Class, that the counties consistently imposed forfeitures far in excess of the underlying amounts involved in the illegal act.

### Count IV: The Defendants and Defendant Class committed the tort of inverse condemnation against the Plaintiffs and Plaintiff Class and Subclasses.

164.    "Inverse condemnation is a cause of action that allows a landowner to recover compensation for the taking of property interests in circumstances where the governmental entity involved has not initiated eminent domain proceedings." *Kaskaskia Land Co., LLC v. Vandalia Levee & Drainage Dist.*, 2019 IL App (5th) 180403, P22.

165.    Inverse condemnation includes "a direct appropriation or ouster that would be compensable." *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, P51.

166.    This is precisely what happened here: the Plaintiffs and Plaintiff Class and Subclasses owned each piece of property, the government took each piece of property, but the government did not take the property through eminent-domain proceedings. Instead, the county directly appropriated the property through a tax foreclosure and took the surplus value above and beyond the taxes owed (or allowed the tax lien investor to keep the surplus value). This is classic inverse condemnation: taking property without going through eminent-domain proceedings and therefore without paying just compensation.

167.    When an inverse condemnation takes place, the government owes just compensation to the former property owner. Here, just compensation equals the difference between the taxes and the fair market value of the property. "Just compensation is the fair market value of the property at its highest and best use on the date the complaint is filed. Fair market value is the amount of money a willing buyer

under ordinary circumstances would pay to a willing owner in a voluntary sale when neither party is under any obligation to buy or sell." *DOT v. Drury Displays, Inc.*, 327 Ill. App. 3d 881, 888 (5th Dist. 2002).

### Count V: The Plaintiffs and Plaintiff Class and Subclasses's money was subject to tortious conversion by the Defendants and the Defendant Class.

168.     "To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 229 Ill. 2d 104, 127 (2008).

169.     "Where money is the subject of the alleged conversion, the plaintiff must further demonstrate that the money is capable of being described" with specificity. *Fonda v. General Cas. Co.*, 279 Ill. App. 3d 894, 899 (1st Dist. 1996).

170.     The Plaintiffs and the Plaintiff Class and Subclasses have a right to the surplus value above the taxes and fees owed, per *Tyler*.

171.     That right is immediate, absolute, and unconditional.

172.     The Plaintiffs and the Plaintiff Class and Subclasses are excused from the necessity of making a demand "where the defendant no longer possesses the chattel [because] the law will not require the doing of a useless act." *Monroe County Water Cooperative v. Waterloo*, 107 Ill. App. 3d 477, 481 (1982).

173.    Here, the Defendants and Defendant Class executed the tax deeds, thus converting Plaintiffs' property, but then transferred the property to either the tax-lien holder or a buyer at auction; either way, the county no longer possesses the property. As a result, a demand would be futile because the Defendants no longer possess the property at issue (or the surplus value in the property).

174.    If necessary, the Court could create a subclass of Plaintiffs specific to this claim to exclude those Plaintiffs whose land is still owned by the Defendants. *See* 735 ILCS 5/2-802(a).

175.    The Defendants and Defendant Class wrongfully took the surplus value: it was an unconstitutional act, per *Tyler*.

176.    The money that has been converted is capable of being described with specificity: the difference in each individual case between the fair market value of the property and the amount of taxes and fees owed on the property.

177.    When a taking occurs, the government owes the property owner just compensation promptly, not years later. Here, the government is taking the property and has no intention of returning the funds, at the time of the taking or in the future. That is the act of conversion.

178.    Therefore, all four elements are met: the Plaintiffs have a right to the specific funds, that right is immediate, the need to demand return of the funds is excused, and the taking of the funds was wrongful.

### Count VI: The Defendants and Defendant Class enjoy unjust enrichment from their theft of the surplus value.

**179.**     "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989).

**180.**     All of these elements are met in this instance. Regardless of whether the Defendants and Defendant Class retained the property, auctioned the property themselves, or sold the tax lien to third-party investors, they secured surplus value in their own accounts that they have unjustly retained, either as the real property itself or as the money from the sale proceeds.

**181.**     The retention of the property or sale proceeds in excess of what a debtor owes is contrary to fundamental principles of equity and justice, as indicated by the fact that Illinois forbids banks to keep excess surplus from foreclosure sales and by the fact that the Bill of Rights forbids the keeping of excess surplus.

**182.**     For those properties that the county retains, it is unjustly enriched by the retention of the surplus value, either on an ongoing basis or when it sells the property. For those properties that the county tax deeds to a private investor, the county is unjustly enriched by realizing a higher price from the tax buyer because of the possibility of value theft.

### *Count VII: The Defendants and Defendant Class have committed the tort of money had and received.*

**183.**    "A cause of action for money had and received is maintainable where defend-ant has received money that in equity and good conscience belongs to the plaintiff." *Bueker v. Madison Cnty.*, 2016 IL App (5th) 150282, P53.

**184.**    Here, the Defendants received money (the surplus value) that in equity and good conscience belongs to the Plaintiffs.

**185.**    Again, if necessary, the Court can certify a subclass of Plaintiffs specific to this claim for property owners whose properties were retained or sold at auction by the Defendants or the Defendant Class.

## PRAYER FOR RELIEF

Given the foregoing, Plaintiffs, on behalf of themselves and the Plaintiff Class and Subclasses, respectfully request that the Court:

186.    Certify the Plaintiff Class, designate the Plaintiffs as representatives of the Plaintiff Class, and appoint the undersigned as Class Counsel;

187.    Certify the Defendant Class, designate the Defendants as representatives of the Defendant Class, and appoint the counsel for Defendants as Class Counsel;

188.    Pursuant to the Declaratory Judgment Act (28 U.S.C. §2201 and Fed. R. Civ. Proc. 57), provide relief by declaring that the uncompensated seizure of surplus value in property pursuant to Illinois's statute governing property taxation is unlawful under the Fifth Amendment to the U.S. Constitution;

189.    Award Plaintiffs and the Plaintiff Class just compensation for the unconstitutional taking of their property, namely the difference between the back taxes and interest owed and the fair market value of their property at the time of the tax foreclosure deed's issuance, with interest;

190.    Award Plaintiffs and the Plaintiff Class economic damages for the torts committed against them, namely the difference between the taxes and fees owed and the fair market value of their properties;

191.    In the alternative, if necessary, certify a subclass of Plaintiffs whose properties were sold at auction or retained by the Defendants or Defendant Class and award economic damages specific to the claim for unjust enrichment;

192.    Award the Plaintiffs and Plaintiff Class nominal damages for the violation of their state and federal constitutional rights;

193.    Award the Plaintiffs and the Plaintiff Class reasonable attorney's fees and costs, as provided by law;

194.    Grant the Plaintiffs and the Plaintiff Class such other relief as is just and proper to recognize their claims and protect their rights to just compensation and appropriate damages.

## JURY DEMAND

Plaintiffs demand a jury for the resolution at trial of all issues so triable and will ensure adequate trial counsel as provided in the local rules when trial is scheduled.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr, WI #1056658
    *Admitted to the Southern District of Illinois*
747 N. LaSalle St., Suite 210
Chicago, IL 60654
414.588.1658
danielsuhr@gmail.com

_____
Christopher E. Mills
    *(pro hac vice application forthcoming)*
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law