## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

TOP METAL BUYERS INC., *et al.*, on
behalf of themselves and all others
similarly situated,

　　　　　Plaintiffs,

v.

ANDREW LOPINOT, ST. CLAIR
COUNTY, JOE AIELLO, SANGAMON
COUNTY, KELLY VINCENT, HENRY
COUNTY, ANGELA G. GRAVES,
MCDONOUGH COUNTY, CHRIS
SLUSSER, MADISON COUNTY, and
DAVID HARRIS,

　　　　　Defendants.

Case No. 3:24-CV-1073-NJR

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

The Plaintiffs in this putative class action claim to be victims of "institutionalized theft" by their county government thanks to Illinois's property tax statutes. The scheme allegedly works like this: people or businesses fall behind on paying their property taxes, often by only a few thousand dollars. (Doc. 41 at ¶ 3). The county then executes a tax deed and either takes the property itself or sells it to a tax-lien buyer who has purchased the back taxes on the property. (*Id.*). The taking is for the entire value of the property, not only the value of the taxes owed. (*Id.*). The surplus value—the difference between the taxes owed and the value of the property—is never returned to the former owner. (*Id.*). Plaintiffs claim this "stealing" of the surplus value is unconstitutional under the Fifth Amendment to the U.S. Constitution, as incorporated against the States through the

Fourteenth Amendment. (*Id.* at ¶ 5). Plaintiffs also claim violations of the takings clause of the Illinois Constitution and the Eighth Amendment's prohibition against excessive fines, and they assert Illinois state law claims including inverse condemnation, tortious conversion, unjust enrichment, and money had and received.

The Defendants, several Illinois counties and their respective Treasurers, as well as David Harris, the Director of the Illinois Department of Revenue, have each filed Motions to Dismiss Plaintiffs' Amended Complaint. (Docs. 53, 65, 66, 67, 68, 72, 73). Plaintiffs do not oppose the dismissal of Defendant Harris, so his motion will be granted, and he will be dismissed without prejudice. Plaintiffs filed an omnibus response to Defendants' motions (Doc. 76), and Defendants joined in a reply (Doc. 79). The Court also granted five Motions to Supplement filed by Plaintiffs (Docs. 97, 90, 92, 95) and granted the St. Clair County Defendants' Motion for Leave to File a Supplemental Memorandum in Support of the Pending Motions to Dismiss (Doc. 95).

For the following reasons, the remaining Defendants' motions are granted in part and denied in part.

FACTUAL BACKGROUND

A. *Illinois's Property Tax Code*

Each year, the State of Illinois assesses taxes on real property in accordance with the Property Tax Code, 35 ILCS 200, *et seq.* If a property owner fails to pay their real estate taxes, the Property Tax Code provides Illinois counties with several procedures for satisfying the lien of real estate taxes. (Doc. 41 at ¶ 41). One method by which a county may enforce the collection of property taxes is through a tax sale. (*Id.* at ¶ 42).

At a tax sale, potential tax buyers bid on the interest rate they will charge the property owner to redeem the property. (Doc. 76 at p. 7). The buyer who bids the lowest interest rate wins and pays the county the taxes owed. (*Id.*). In this case, Plaintiffs allege that the Defendant Counties sell property tax liens to third-party investors, who then charge "usurious rates of interest through a redemption period (usually 30 months), during which the property owner can pay the back taxes with fees and interest." (*Id.* at ¶ 43). If the property owner fails to redeem the property, the tax buyer can file for a tax deed foreclosure on the home. 35 ILCS 200/22-30. The state court then directs the county official to issue a tax deed if the tax buyer provides "sufficient evidence" that all statutory requirements have been met. 35 ILCS 200/22-40. If no one buys the taxes at a tax sale, the lien remains in the favor of the county and the forfeiture may be redeemed from the county at a penalty rate of 12 percent per year. (*Id.* at ¶ 45). There is no time limit within which a forfeiture must be redeemed from the county. (*Id.*)

Plaintiffs allege that a taking occurs when the County issues a tax deed transferring ownership of the entire property from the taxpayer to the lienholder or other purchaser (including sometimes the county itself) without furnishing them just compensation for the surplus value of their property. (*Id.* at ¶ 68). Plaintiffs note that the theft of surplus value is only possible when the government authorizes it through a property-tax deed; private entities like banks must return the surplus equity in the property above the mortgage to the debtor. (*Id.* at ¶¶ 75-76). Furthermore, Illinois is one of the few states, perhaps the only, that authorizes this procedure. (*Id.* at ¶ 78).

Illinois does mandate that for every tax-lien sale, a fee must be paid into that

county's Indemnity Fund. (*Id.* at ¶ 79). If a tax deed is issued in Illinois, real estate owners who have lost their title are eligible to seek the surplus value of the property by making a claim under each counties' Indemnity Fund. 35 ILCS 200/21-295 *et seq.* To make such a claim, the former property owner must first file a legal action after the entire foreclosure process is complete. 35 ILCS 200/21-305(b). The maximum recovery from the Indemnity Fund for a one- to four-unit residential property is $99,000, unless the claimant can prove the loss of the property was not due to fault or negligence of their own. (*Id.* at ¶ 80); 35 ILCS 200/21-305(a)(1). Claimants with more than four dwelling units or who are commercial owners also can only be considered for awards if they show that there was no "fault or negligence" of their own. 35 ILCS 200/21-305(a)(2). Additionally, the Indemnity Funds are underfunded by the Defendant Counties, and, thus, have insufficient funds to provide just compensation to Plaintiffs. (*Id.* at ¶¶ 84, 90). Plaintiffs assert that "[t]he Illinois code authorizes judges to cite the underfunding of an Indemnity Fund as a reason to give a petitioner less than full just compensation." (*Id.* at ¶ 92). Plaintiffs also assert that in addition to the Indemnity Funds being underfunded, many homeowners are unaware of the funds or do not qualify for coverage. (*Id.* at ¶ 87). The limitation period for an Indemnity Fund claim is 10 years after the date that the Tax Deed was issued. *See* 35 ILCS 200/21-305. The named Plaintiffs do not allege that they attempted to pursue recovery through any County's Indemnity Fund.

B. *Tyler v. Hennepin County*

In 2023, the U.S. Supreme Court held that although the taking of the property to satisfy delinquent taxes is itself legal, the failure to provide just compensation for the

surplus value beyond the delinquent taxes is unconstitutional. (*Id.* at ¶ 4); *Tyler v. Hennepin County*, 598 U.S. 631 (2023). In *Tyler*, Hennepin County, Minnesota, sold the plaintiff's home for $40,000 to satisfy a $15,000 tax bill. *Id.* at 634. Instead of returning the remaining $25,000 to the plaintiff, the County kept it. *Id.* The Supreme Court observed that "[t]he County had the power to sell Tyler's home to recover the unpaid property taxes. But it could not use the toehold of the tax debt to confiscate more property than was due. By doing so, it effected a classic taking in which the government directly appropriates private property for its own use." *Id.* at 639 (quotation omitted). The Supreme Court also noted that Minnesota's tax scheme "provides no opportunity for the taxpayer to recover the excess value; once absolute title has transferred to the State, any excess value always remains with the State." *Id.* at 644. Under these facts, the Court held, Tyler plausibly alleged that the County's retention of the excess value of her home above her tax debt violated the Takings Clause. *Id.* at 647.

Plaintiffs here allege that, post-*Tyler*, the Defendant County Treasurers could have adopted policies to ensure their residents obtain just compensation from tax buyers, but they have not. (*Id.* at ¶ 72). Likewise, after the decision in *Tyler*, the Defendants should have refunded the surplus value that the Defendant Counties stole from the Plaintiffs. (*Id.* at ¶ 95). Their failure to do so, Plaintiffs contend, constitutes an unconstitutional taking. (*Id.* at ¶¶ 95-97).

C. *The Plaintiffs*

Each of the named Plaintiffs are property owners whose properties were taken by their respective County to either be transferred to private buyers or kept by the County.

(Doc. 76 at p. 7). Even though the amount of taxes they owed was less than their property value, they were not compensated for the surplus value. (*Id.*).

### 1. Top Metal Buyers, Inc.

Top Metal Buyers formerly owned commercial property located in East Saint Louis, Illinois, and it owed $44,089.58 on the property. The fair market value of the property, however, was $102,279. When the treasurer of St. Clair County issued a tax deed and took the property, Top Metal Buyers lost over $55,000 in surplus value. (Doc. 41 at ¶ 50).

### 2. Shelly Branson

Shelly Branson owned a single-family home in East St. Louis, Illinois. After his wife died, Branson fell behind on paying the property taxes, owing $14,145. The fair market value was five times that--$76,756. When the treasurer of St. Clair County issued a tax deed and took the property, Branson lost $60,000 in surplus value. (*Id.* at ¶ 51).

### 3. Debra Mosby

Debra Mosby formerly owned her home in East Saint Louis, Illinois. She owed $14,812.87 on the property. The St. Clair County treasurer took the property through a tax deed, costing her almost $30,000 in stolen value, as the fair market value was $53,607. (*Id.* at ¶ 52).

### 4. Jesse Beechler

Jesse Beechler owned a home in Springfield, Illinois, before he lost it to a tax sale. Beechler owed $6,808.11 in taxes and fees on the property. The treasurer of Sangamon County took the property and sold it for $57,500, costing Beechler $50,000 in stolen value.

(*Id.* at ¶ 53).

### 5. Mark Harrison

Mark Harrison also owned a home in Springfield, Illinois, before Sangamon County issued a tax deed taking the property. At the time, he owed $5,681.90 on the property, and its fair market value was $60,737. Harrison, therefore, lost $55,000 in surplus value. (*Id.* at ¶ 54).

### 6. Don Gilliam

Don Gilliam formerly owned a home in East Carondelet, Illinois. He owed $10,178.20 on the property. Its fair market value was $112,700. When St. Clair County executed the tax deed, Gilliam lost over $100,000 in value. (*Id.* at ¶ 55).

### 7. Shirley Ferrell

Shirley Ferrell owned a home in East Saint Louis, Illinois. She thought her property taxes were being taken out with her mortgage payments. But because the taxes were unpaid, they were sold to a tax buyer. Ferrell owed $7,320.13 for redemption, but the fair market value of the property was $84,708. Eventually, St. Clair County issued a tax deed, and she lost over $75,000 in value. (*Id.* at ¶ 56).

### 8. Trenise Hill

Trenise Hill formerly owned a home in Cahokia, Illinois. She owed $8,964.27 for redemption, but the fair market value of the property was $58,200. The St. Clair County Treasurer issued a tax deed, and she lost nearly $50,000 in value. (*Id.* at ¶ 57).

### 9. Aaron Lindquist

Aaron Lindquist formerly owned commercial property in St. Colona, Illinois, in

Henry County. The tax redemption cost was $82,981.30 when the property was taken, but its fair market value was $249,792. The 30-acre lot was zoned as Improved Commercial and was home to Aaron's Affordable Towing, Lindquist's small business. (*Id.* at ¶ 58).

### 10. Domishae Johnson

Domishae Johnson formerly owned a home in Cahokia, Illinois, in St. Clair County. The redemption cost at the time of the taking was $12,635, but the fair market value was $56,400. (*Id.* at ¶ 59).

### 11. Laurie Markley

Laurie Markley formerly owned five residential properties in McDonough County, the fair market value of which exceeded the tax redemption at the time of the taking. (*Id.* at ¶ 60).

### 12. Sydney Osborne

Sydney Osborne owned residential property in Edwardsville, Illinois, in Madison County. The cost of the tax redemption was $8,210.79. Yet, the property sold for $187,000 in April 2023, meaning she lost almost $180,000 in value. Osborne found the letter on her door for eviction the day she came home after having a liver transplant. (*Id.* at ¶ 61).

### 13. Scott Karfs

Scott Karfs formerly owned a home in Belleville, Illinois, in St. Clair County. The tax redemption value was $11,545.77, but the property's fair market value was $153,400. The home originally belonged to his parents. When they passed away, the property went to Karfs and his brother, who did not realize that taxes were accruing. Karfs's brother was serving in Kuwait and was dealing with mental illness at the same time he was taking

care of financial matters for their mom. The day Karfs's brother got the letter saying the County was going to take the house, he hung himself. (*Id.* at ¶ 62).

Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b). The proposed class is defined as:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois; (2) their property was subject to a tax deed taking by a county; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

(*Id.* at ¶ 99).

Alternatively, due to pending related class litigation in other Illinois counties, Plaintiffs propose the following Subclass:[1]

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of Illinois other than in Cook and/or DuPage, Kane, Lake, Will, Winnebago, Boone, Carroll, and Peoria counties; (2) their property was subject to a tax deed taking by a county; (3) the fair market value of the property at the time of the tax deed foreclosure exceeded the back taxes and interest owed at the time the tax deed was issued.

(*Id.* at ¶ 103).

### D. The Defendants

The Defendants in this matter include St. Clair County, Sangamon County, Henry

---

[1] The related litigation is pending in the Northern District of Illinois. In *Sharritt v. DuPage County*, No. 1:23-cv-15838 (N.D. Ill.), the plaintiffs seek to certify a class on behalf of property owners with similar legal claims in DuPage, Kane, Lake, Will, Winnebago, Boone, Carroll and Peoria counties. Plaintiffs have yet to move for class certification. In *Kidd v. Pappas*, No. 22-cv-7061 (N.D. Ill.), class certification has been granted to a class of approximately 1,700 former property owners in Cook County. *Id.* at Doc. 180.

County, McDonough County, Madison County, and their respective Treasurers: Andrew

Lopinot, Joe Aiello, Kelly Vincent, Angela G. Graves, and Chris Slusser. Each Treasurer

is sued in his or her official capacity only. Plaintiffs also propose a Defendant Class

defined as:

> All Illinois county governments and their elected treasurers who (1) make the policy choice to collect at least some delinquent property taxes through tax sales and (2) executed or aided in the execution of tax-deed foreclosures on properties where the fair market value of the property exceeded the amount of back taxes and interest owed on the property at the time of the foreclosure.

(*Id.* at ¶ 120).

## LEGAL STANDARDS

In evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1) of the

Federal Rules of Civil Procedure, a court must first determine whether a factual or facial

challenge has been raised. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "A factual

challenge contends that 'there is *in fact* no subject matter jurisdiction,' even if the

pleadings are formally sufficient. *Id.* (citation omitted). A facial challenge, by contrast,

accepts the pleaded facts as true but argues that they have not sufficiently alleged a basis

for subject matter jurisdiction." *Id.* When evaluating a factual challenge, as Defendants

have raised here, "the court may look beyond the pleadings and view any evidence

submitted to determine if subject matter jurisdiction exists." *Id.* Motions for dismissal

under the *Rooker–Feldman* doctrine or for lack of supplemental jurisdiction fall under Rule

12(b)(1). *See Mains v. Citibank, N.A.*, 852 F.3d 669, 679 (7th Cir. 2017).

When reviewing a motion to dismiss under Rule 12(b)(6), the Court must consider whether the complaint states a claim for relief that is "plausible" on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff need not plead detailed factual allegations, but must provide more than "a formulaic recitation of the elements." *Twombly*, 550 U.S. at 570; *see also Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 645 (7th Cir. 2022) ("all a complaint must do is state a plausible narrative of a legal grievance that, if proved, would entitle the plaintiff to relief"). While the court accepts as true all well-pleaded facts and draws reasonable inferences in the plaintiff's favor, it does not accept legal conclusions. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013).

## DISCUSSION

Defendants have each filed motions to dismiss in addition to incorporating by reference all arguments made by the other Defendants. The Court, therefore, addresses each argument as if brought by all Defendants, beginning with this Court's subject matter jurisdiction.

## I.    Subject Matter Jurisdiction

Defendants first argue this Court lacks subject matter jurisdiction to review Plaintiffs' constitutional claims under the *Rooker-Feldman* doctrine. (Docs. 65, 75). Under 28 U.S.C. § 1257(a), only the Supreme Court is "vested with appellate authority over state

courts." *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 765 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1167 (2025) (quoting *Sykes v. Cook County Circuit Court Probate Div.*, 837 F.3d 736, 741 (7th Cir. 2016)). The *Rooker-Feldman* doctrine provides that "district courts should disclaim jurisdiction only in 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 766 (quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005)).

A district court lacks subject matter jurisdiction under *Rooker-Feldman* when four elements are present. *Id.* "First, the federal plaintiff must have been a state-court loser. Second, the state-court judgment must have become final before the federal proceedings began. Third, the state-court judgment must have caused the alleged injury underlying the federal claim. Fourth, the claim must invite the federal district court to review and reject the state-court judgment." *Id.*

Defendants contend that Plaintiffs' claims are based on the issuance of a state-court judgment and, thus, are barred by *Rooker-Feldman*. For example, Plaintiffs allege the Fifth Amendment is violated when a Defendant County, through its officials, "issues a tax deed transferring the entire property from the taxpayer" to a tax buyer without just compensation to the original owner. Similarly, Plaintiffs' Excessive Fines Clause claim under the Eighth Amendment is based on the issuance of a tax deed transferring real property to a tax buyer. Because the issuance of a tax deed, as a matter of law, follows a final judgment of an Illinois circuit court, Defendants argue that this Court is barred by

*Rooker-Feldman* from reviewing the judgment. Defendants then assert that the Court should decline to retain supplemental jurisdiction over the remaining state law claims.

Plaintiffs, in opposition, argue that the third and fourth elements described in *Gilbank* are not present here. Plaintiffs are not claiming that state-court judgments caused them injury, nor are they asking this Court to reject those judgments. Indeed, Plaintiffs have pleaded that "the tax deed itself is legitimate and Plaintiffs do not challenge the judgment or deed or ultimate foreclosure on their property." (Doc. 41 at ¶ 68). Instead, they are only challenging Defendants' failure to provide just compensation for the property after it is taken. Plaintiffs argue that no state-court judgment required Defendants to deny just compensation.

The Court agrees with Plaintiffs that *Rooker-Feldman* does not apply to their claims. Plaintiffs do not allege that the state-court judgments caused them harm. Rather, they seek monetary compensation for the taking of the surplus value of their properties. Furthermore, Plaintiffs' request for compensation owed does not require this Court to review and reject any state-court judgments.

Defendants cite *Beth-El All Nations Church v. City of Chicago* for the proposition that the *Rooker-Feldman* doctrine applies to claims arising out of tax deed judgments, but the Court is not persuaded. 486 F.3d 286 (7th Cir. 2007). In that case, the plaintiff church sought "to retain possession and regain title to the property" that it lost after the parcel was sold for delinquent taxes. *Id.* at 292. The church had failed to redeem the property after a notice was sent to the wrong address. *Id.* at 287. The Seventh Circuit Court of Appeals observed that the church "never identified any injury separate from the tax deed

judgment." *Id.* at 292. Therefore, its injury was caused by—and its claims arose directly out—the tax deed judgment. Accordingly, the court found that *Rooker-Feldman* barred the church's claims.

That is not the case here. Plaintiffs are only challenging Defendants' refusal to furnish them just compensation for the surplus value of their property, not the issuance of the tax deed itself. Thus, the Court finds that the *Rooker-Feldman* doctrine does not bar it from hearing Plaintiffs' claims.

## II.    Immunity as to the County Treasurers

### A.   *Sovereign Immunity*

"'Sovereign immunity is the privilege of the sovereign not to be sued without its consent' and is secured to the states by the Eleventh Amendment." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021) (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)). In interpreting the Eleventh Amendment, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Id.* The Eleventh Amendment bar, however, "does not extend to counties and similar municipal corporations." *Scott v. O'Grady*, 975 F.2d 366, 371 (7th Cir. 1992). The pivotal question is whether the defendant was acting as an agent of the state or as a county official. *Id.* In determining whether a county official "is an agent of Illinois government when performing particular functions, [the Seventh Circuit has] looked to the degree of control exercised by Illinois over the conduct at issue and whether the Eleventh Amendment policy of avoiding interference with state (as opposed to county) policy is offended by

the lawsuit." *Richman v. Sheahan*, 270 F.3d 430, 439 (7th Cir. 2001).

The County Treasurer Defendants argue that they are protected by sovereign immunity from Plaintiffs' claim that they are liable under Section 1983 for their role in the tax sale and tax deed process. They assert that their actions were taken in compliance with enforceable state-court judgments, *i.e.*, judicial orders they were required to follow. Likewise, Defendants argue, the Property Tax Code imposes non-discretionary obligations on county treasurers in various aspects related to the tax sale and tax deed process.[2] *See* 35 ILCS 200 *et seq.* In support of their argument, Defendants cite to *Scott*, where county sheriffs were found to be acting as an arm of the Illinois state judicial system when enforcing orders issued by state courts. *Id.* at 371. Because Section 1983 suits against individuals acting in their official capacities for the State are barred by sovereign immunity, they argue, the claims against the County Treasurers must fail.

In response, Plaintiffs assert they are not challenging any non-discretionary aspect of the clerks' or treasurers' state-law duties or their compliance with any judicial order, but rather only the failure to provide just compensation for the taken property. Plaintiffs also point the Court to *Sharritt v. Henry*, where the Northern District of Illinois considered the same arguments made against the treasurers and clerks of Winnebago, Peoria, Will, Carroll, Newport, Boone, DuPage, Lake, and Kane counties. *Sharritt v. Henry*, No. 23 C 15838, 2024 WL 4524501, at *5 (N.D. Ill. Oct. 18, 2024). In that case, the district

---

[2] Plaintiffs assert that Defendants have not specified which duties they are obligated to perform under Illinois law, citing only to the Sangamon and McDonough County Treasurers' Motion to Dismiss (Doc. 74). Both the St. Clair County and Henry County Defendants, however, have provided the Court with citations to each provision of the Property Tax Code that mandates non-discretionary action by county treasurers. (Doc. 67 at pp. 33-34; Doc. 69 at pp. 24-25).

court noted that the plaintiffs were not challenging anything the treasurers or clerks were compelled by state law to do during the tax sale process, but rather for failing to provide just compensation *after* enforcement of the tax law is complete. *Id.*

In the Amended Complaint, Plaintiffs state, "[t]heir claim is that—after the foreclosure judgment was entered—the treasurer issued a tax deed taking their property without furnishing them just compensation for the surplus value of their property." (Doc. 41 at ¶ 46). They further allege in their Amended Complaint that the Property Tax Code "relies on the County Treasurer, who issues the judgment book, auctions the liens, collects the fees, and administers the Indemnity Fund. The Treasurer also has a role, alongside the County Clerk, in issuing the tax deed." (*Id.* at ¶ 67). Plaintiffs claim that the Defendant Treasurers "could have adopted policies that ensure their residents obtain just compensation from tax buyers who foreclose," but they have not. (*Id.* at ¶ 72).

In *Sharritt*, the Northern District observed in a footnote the defendants' argument that Illinois law provides no statutory mechanism to compensate the plaintiffs for any surplus equity lost as a result of the Illinois tax sale procedures. *Sharritt*, 2024 WL 4524501, at *5 n.5. That the State does not have a mechanism to immediately return the surplus property value to the original owner is why this Court finds Defendants do not enjoy sovereign immunity under the Eleventh Amendment. To be certain, the Treasurer Defendants are acting as agents of the State in fulfilling their duties under the Property Tax Code. But once the Treasurers issue a tax deed, their role as a State actor is complete. As County Treasurers, Plaintiffs allege, the Defendants made a policy choice not to require the return the surplus value to the property owner. (Doc. 41 at ¶ 72) ("[T]he

treasurers here could have adopted policies that ensure their residents obtain just compensation from tax buyers who foreclose.").

The St. Clair County Defendants argue that the issuance of the tax deed on behalf of the State is the "taking" that Plaintiffs complain of. But it is not the bare issuance of the tax deed transferring the property that violates the Constitution. *See Tyler*, 598 U.S. at 638 (in collecting taxes, "a State may also seize and sell property, including land, to recover the amount owed"). It is the issuance of a tax deed *without providing just compensation* for the surplus value of the property that the Supreme Court has deemed a violation of the Fifth Amendment. *Id.* at 639 ("The County had the power to sell Tyler's home to recover the unpaid property taxes. But it could not use the toehold of the tax debt to confiscate more property than was due. By doing so, it effected a "classic taking in which the government directly appropriates private property for its own use.").

Because the Plaintiffs are challenging the Treasurers' discretionary policy decision not to provide just compensation after the property is transferred—and not any action mandated by State law—the Treasurers are not protected by sovereign immunity.

B. *Quasi-Judicial Immunity*

The Treasurer Defendants likewise argue that the doctrine of quasi-judicial immunity extends to shield them from liability for their actions in enforcing court orders related to the issuance of a tax deed. But as discussed in regard to sovereign immunity, Plaintiffs are not challenging any actions taken in furtherance of a court order. Rather, Plaintiffs take issue with the Treasurers' policy decisions not to require that Plaintiffs be compensated for the seized property value. For this reason, Defendants are not immune

from suit.

    C. *Qualified Immunity*

Finally, the County Treasurers contend they are entitled to qualified immunity. "Qualified immunity shields a government official from suit for damages under § 1983 'when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.'" *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Qualified immunity applies when (1) the official violated a statutory or constitutional right, and (2) the right was not "clearly established" at the time of the challenged conduct. *Id.* A constitutional or statutory right is "clearly established" when the law is "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* at 843-44 (cleaned up and citation omitted).

A Rule 12(b)(6) motion to dismiss is not always "(if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020). "Ultimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not state a claim of violation of clearly established law." *Id.* at 590 (quotation omitted).

The County Treasurers argue that the Illinois Property Tax Code has been upheld as constitutional. Furthermore, the Indemnity Fund has been held to be the exclusive remedy for delinquent taxpayers who have lost their property through the tax sale

procedure. Thus, there is no basis to allege that the County Treasurers had reason to know that following the Property Tax Code was a violation of the law. Even if *Tyler* changed the law specific to Illinois's statutory structure, which Defendants assert it did not, any actions pre-*Tyler* are entitled to qualified immunity.

As Plaintiffs argue, however, qualified immunity does not apply to official capacity claims. "The doctrine of qualified immunity exists to protect public officials performing discretionary functions from civil damages." *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). But "[o]fficial capacity suits do not, by definition, place the public official at risk of personal liability." *Id.* Thus, because the County Treasurers are sued in their official capacities only, qualified immunity does not shield them from liability.

## III.    Failure to State a Claim

### A.  *Takings Claims (Counts I and II)*

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. In Count I of the Amended Complaint, Plaintiffs allege that Defendants had "an established policy and practice of taking property without just compensation" in violation of the Takings Clause. Specifically, Plaintiffs allege that "the counties took property from the plaintiffs and the class members by retaining surplus value in connection with property taken to satisfy a tax lien," and, under *Tyler*, that violates the Constitution. (Doc. 41 at ¶ 145). Count II alleges a taking under the Illinois Constitution, which provides that "[p]rivate property

shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. art. I, § 15.

Defendants argue that Plaintiffs have not alleged a taking because Illinois counties do not receive any funds that exceed the amount due for delinquent property taxes. Because it is the delinquent property *taxes* that are sold, not the properties themselves, the Defendant Counties typically receive only the delinquent taxes they are owed. In the event there are no bids on a parcel, a tax sale certificate is issued to the County as trustee of the taxing districts that lie within that parcel. Counties may sell the parcel, but the proceeds of any sale—less all costs associated with the acquisition, operation, maintenance, and overhead costs—are distributed to the taxing districts in proportion to their respective interests. 35 ILCS 200/21-90(c). Unlike the defendant in *Tyler*, the Defendant Counties here do not keep any surplus in excess of the debt owed.

Defendants further note that, unlike Minnesota's tax scheme discussed in *Tyler*, where taxpayers had no opportunity to recover the excess value of their former property, the Illinois Property Tax Code gives property owners who "sustain loss or damage by reason of the issuance of a tax deed" 10 years to apply for compensation from the Indemnity Fund. 35 ILCS 200/21-305. Because Illinois affords Plaintiffs a statutory mechanism for relief, which Defendants assert is the "exclusive remedy" for the relief Plaintiffs request, Plaintiffs have not stated a claim for a taking.

In response, Plaintiffs assert that the Indemnity Funds provide, at most, an alternative state-law remedy: the funds do not guarantee the full compensation that the

Constitution demands, as awards are subject to arbitrary cutoffs and equitable balancing; the Counties intentionally underfund them; and most claimants have no real prospect of any timely recovery. Plaintiffs cite to *Knick v. Township of Scott, Pennsylvania*, in which the Supreme Court held, as a procedural matter, that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it . . . regardless of post-taking remedies that may be available to the property owner." *Id.* at 189-90. The plaintiff need not first exhaust any state remedies. *Id.* at 189. "The fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right." *Id.* at 191. Thus, Plaintiffs argue, they have no duty to try to recover under the Indemnity Fund before seeking just compensation through a federal lawsuit.

The Court agrees with Plaintiffs that the existence of the Indemnity Fund does not relieve Defendants of the Constitutional requirement to provide just compensation when private property is taken for public use. The U.S. Supreme Court has "repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.'" *Horne v. Dep't of Agric.*, 576 U.S. 350, 368–69 (2015) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)). And the compensation "must be a full and perfect equivalent for the property taken." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893); *see also United States v. Miller*, 317 U.S. 369, 373 (1943) ("[Just] compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied

if his property had not been taken.").

Under Illinois law, however, "[a]n equitable indemnity award shall be limited to the fair cash value of the property as of the date the tax deed was issued less any mortgages or liens on the property, *and the award will not exceed $99,000.*" 35 ILCS 200/21-305(a)(1) (emphasis added). Further, the Illinois statute gives courts discretion to determine whether the equities warrant compensation. *Id.* If the owner seeks more than $99,000, the owner must prove the loss of his or her property "was not attributable to his or her own fault or negligence." *Id.* In other words, full compensation—if any—is not guaranteed. *See Sharritt*, 2024 WL 4524501, at *12 ("[T]he Indemnity Fund is a post-deprivation form of relief that limits the amount a petitioner is entitled to recover—if at all based on a court's equitable judgment—and imposes a stricter evidentiary burden on recoveries greater than an arbitrary amount.").

The fact that the Defendant Counties do not keep any surplus funds exceeding the amount due for delinquent property taxes is irrelevant, as the Supreme Court has held that the "'just compensation' required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 235–36 (2003).

The Court also is not persuaded by Defendants' comparison of this case with *Nelson v. City of New York*, 352 U.S. 103 (1956), where New York City foreclosed on properties for unpaid water bills. Under the City's ordinance, a property owner had seven weeks to redeem a property through payment of back charges, and an additional 20 days to ask for the surplus from any tax sale. *Id.* at 105-06. Upon review of a challenge

from property owners, the Supreme Court noted that the City's ordinance allowed an owner to file an answer in a foreclosure proceeding asserting his property had a value substantially exceeding the tax due. *Id.* at 110. Upon proof of this allegation, a separate sale would be conducted so that the owner would receive the surplus. *Id.* Because the ordinance did not "absolutely preclud[e] an owner from obtaining the surplus proceeds of a judicial sale," but rather "defined the process through which the owner could claim the surplus," the Supreme Court upheld it as constitutional. *Tyler*, 598 U.S. at 644 (quoting *Nelson*, 352 U.S. at 110).

This Court acknowledges that Illinois's tax code is more like the ordinance at issue in *Nelson* than that in *Tyler*, as it does not absolutely preclude an owner from some recovery after a tax sale. As explained in *Sharritt*, however, "under *Nelson*'s procedures, recovery was automatic and the amount was readily ascertainable (*i.e.*, New York City sold the property at auction, took what it was entitled to, and returned the rest)." *Sharritt*, 2024 WL 4524501, at *12. But in Illinois, despite the existence of the Indemnity Fund, a former property owner has no guarantee of recovering anything, much less the full surplus value, "and the total amount depends on the whims of the reviewing court's equitable balancing." *Id.* Thus, the Court finds the Illinois tax scheme distinguishable from the process upheld as constitutional in *Nelson*.

Finally, Plaintiffs allege that the Indemnity Funds are structurally underfunded. (Doc. 41 at ¶ 85). For example, by statute, the funds are capped at $1 million for counties with fewer than 3 million residents and $2 million for other counties. And counties "have policy discretion concerning what balance to maintain in the funds, and a financial

incentive to transfer as much as possible out of the indemnity funds and into the general fund." (*Id.* at ¶ 84). As a result, "the indemnity fund in the largest county in Illinois—Cook County—is currently $22 million in debt and has an eight-year backlog in making payments," and "other counties have similarly underfunded accounts compared to the potential demand on them." (*Id.* at ¶¶ 87, 88). At least one case cited by both Plaintiffs and Defendants demonstrates that the "condition and income of the fund are relevant factors that can be considered by a court in making its determination and balancing of the equities of the case." *Malmloff v. Kerr*, 879 N.E.2d 870, 876 (2007) (finding the plaintiff's failure to pay his taxes, at the least, "insidiously naïve and, at the most, fiscally irresponsible," and holding he was not equitably entitled to compensation from the Rock Island County fund when it contained only $9,500).

Taking Plaintiffs' allegations as true, as the Court must do at this stage of the litigation, the Court finds that Illinois law does not ensure just compensation, that is, "a full and perfect equivalent for the property taken." *Monongahela*, 148 U.S. at 326. Therefore, Plaintiffs have stated a claim for a taking under both the Fifth Amendment to the U.S. Constitution and the Illinois Constitution.

B. *Excessive Fine (Count III)*

The Eighth Amendment prohibits the imposition of "excessive fines." U.S. Const. amend. VIII. The Excessive Fines Clause, which applies to the states, *Timbs v. Indiana*, 586 U.S. 146, 151 (2019), requires a two-step analysis. "The first is a threshold determination: Is the sanction punitive or purely remedial?" *Grashoff v. Adams*, 65 F.4th 910, 916 (7th Cir. 2023). "Because the Eighth Amendment 'limits the government's power to extract

payments . . . as punishment for some offense," *Austin v. United States*, 509 U.S. 602, 609–10 (1993), only punitive sanctions fall within its scope; purely remedial sanctions are not subject to Eighth Amendment scrutiny." *Id.* (cleaned up). Civil penalties can constitute punishment if they serve "retributive or deterrent purposes." *Id.* (quoting *Towers v. City of Chicago*, 173 F.3d 619, 625 (7th Cir. 1999)).

If the sanction is punitive, then the second step is to determine whether it is "grossly disproportional to the gravity of [the] . . . offense." *Id.* at 916-17 (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)). "The touchstone of the constitutional inquiry . . . is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish." *Id.*

In Count III, Plaintiffs claim that Defendants levied excessive fines on Plaintiffs in violation of the Eighth Amendment. Specifically, Plaintiffs allege Defendants chose to take the surplus value from delinquent property taxpayers, which is a punitive policy designed to punish lawbreakers and to disincentivize others from breaking the law. Moreover, the sanction is grossly disproportional to the gravity of the offense, considering some property owners forfeit property worth ten times the cost of their unpaid taxes.

Defendants move for dismissal of this claim because the Property Tax Code is not punitive in nature. They argue that Plaintiffs have alleged only that the property tax scheme is "at least in part, a punitive policy designed to punish lawbreakers and disincentive others from lawbreaking." (Doc. 41 at ¶ 157). Defendants explain that Illinois appellate courts have held that the purpose of the tax sale procedure is to encourage

buyers at tax sales, increase the collection of taxes by government authorities, and to free land to reenter the stream of commerce and again shoulder the burden of its share of taxes. *See City of Bloomington v. John Allan Co.*, 310 N.E.2d 437, 446 (Ill. App. Ct. 1974). Defendants also argue that the Defendant Counties receive nothing more than the delinquent taxes, penalties, and interest due; no part of the surplus value goes to them.

In response, Plaintiffs cite to *In re County Treasurer*, 3 N.E.3d 431, 435 (Ill. App. Ct. 2013), to argue that the purpose of the tax deed system is actually to "coerce tax delinquent property owners to pay their taxes," meaning it is not simply remedial in nature. Moreover, as the court in *Sharritt* recognized, given that the amount of equity property owners lose in the tax sale procedure is inherently variable, the forfeiture of that surplus value is a penalty that has no correlation to the amount of taxes owed to the county.

In *Tyler*, the Supreme Court elected not to decide whether the plaintiff had also alleged an excessive fine under the Eighth Amendment. But in his concurrence, Justice Gorsuch, joined by Justice Jackson, explained that "the Excessive Fines Clause applies to *any* statutory scheme that "serv[es] *in part* to punish." *Tyler*, 598 U.S. at 648 (Gorsuch, J., concurring) (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993) (emphasis added)). "It matters not whether the scheme has a remedial purpose, even a predominantly remedial purpose. So long as the law 'cannot fairly be said *solely* to serve a remedial purpose,' the Excessive Fines Clause applies." *Id.* Indeed, he noted, "a statutory scheme may still be punitive where it serves another 'goal of punishment,' such as '[d]eterrence.'" *Id.* at 649 (quoting *Bajakajian*, 524 U.S. at 329). "Economic penalties imposed to deter

willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive." *Id.* at 649-50.

Here, Plaintiffs have alleged that the tax sale procedure implemented by Defendants is designed to punish lawbreakers and disincentivize, *i.e.*, deter, property owners from failing to pay their taxes. Thus, the Court finds that Plaintiffs have adequately alleged the sanction at issue is punitive in nature.

Turning to the second step, Plaintiffs have more than adequately alleged facts that demonstrate the disproportionality of the sanction to the gravity of the offense. The named Plaintiffs here each allegedly forfeited a surplus value that was between two and more than 10 times the taxes they owed. Thus, the Court finds that Plaintiffs have set forth an Eighth Amendment Excessive Fines claim.

### C. *Monell Claim*

The Defendant Counties also argue that the Amended Complaint fails to state a *Monell* claim against them. Under *Monell*, "a local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). However, a policy or custom of "enforcing state law . . . simply cannot be sufficient to ground liability against a municipality." *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991). Because Defendants are merely

carrying out a policy established by state law, and they have no discretion in doing so, they argue, they cannot be held liable under § 1983.

The Court disagrees. Plaintiffs have alleged that the Counties "ma[d]e a policy choice, when transferring the property, not to condition the transfer on return of the surplus value to the property owner." (Doc. 41 at ¶ 69). They also assert that county tax collectors are "not confined to those actions specifically detailed in the Property Tax Code. When the General Assembly conferred on county collectors the power to conduct tax sales, it also conferred, by implication, the authority to do all that is reasonably necessary to execute that power." (*Id.* at ¶ 70). Yet, Plaintiffs allege, the Defendants have not adopted policies to ensure their residents obtain just compensation. (*Id.* at ¶ 72). Plaintiffs also allege that the Counties have discretion concerning the amount of money to keep in their Indemnity Funds, that they have made policy decisions to underfund the accounts, that the Counties have made the policy choice to use tax sales rather than other mechanisms to recover taxes. (*Id.* at ¶¶ 40-43, 84-85).

Because the Court must accept Plaintiffs' allegations as true at the motion to dismiss stage, the Court finds Plaintiffs have adequately satisfied *Monell*'s requirements for bringing § 1983 claims.

## IV.    Illinois State Law Torts

### A. *Tort Immunity Act*

Defendants first argue that Plaintiffs' state law claims are precluded by the Illinois Tort Immunity Act ("Act"). The Act protects local public entities and public employees from liability arising from the operation of government. *Andrade v. City of Kankakee*,

238 N.E.3d 381, 387, *appeal denied*, 232 N.E.3d 18 (Ill. 2024). Section 2-103 of the Act provides that "[a] local public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." Because tort immunity is an affirmative defense, "the governmental entity has the burden of pleading and proving its immunity under the Act." *Monson v. City of Danville*, 115 N.E.3d 81, 100 (Ill. 2022). "A plaintiff's right to recovery is barred only when the governmental entity has met this burden." *Id.*

Defendants argue that they are immune under the Act because Plaintiffs allege they failed to adopt official policies post-*Tyler* to refund the surplus value stolen from them. And, under the Act, local public entities cannot be liable for "failing to adopt" a policy. The Act, however, does not say public entities are immune for "failing to adopt a policy." They are immune for injuries caused by "failing to adopt an enactment." § 2-103. Section 1-203 defines "enactment" as "a constitutional provision, statute, ordinance or regulation." Because Defendants have the burden of proving its immunity under the Act, and Plaintiffs' claims as pleaded are not clearly barred by the Act, the Court declines to find Defendants immune at this time.

B.  *Inverse Condemnation (Count IV)*

"[W]hen a governmental defendant takes or damages private property for public use without a condemnation proceeding, the property owner may sue the defendant, in what is known as an inverse condemnation suit, to recover just compensation for the property that has been taken or damaged." *Berry v. City of Chicago*, 181 N.E.3d 679, 689 (Ill. 2020). Defendants here rely solely on their assertion that Plaintiffs have failed to

allege a taking, whether through possession of the property itself or through the tax sale process. But as discussed above, Plaintiffs have stated a claim for a taking and, therefore, have also stated a claim for inverse condemnation.

C. *Conversion (Count V)*

To state a claim for civil conversion under Illinois law, a plaintiff "must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Z's IT Consulting Servs., Inc. v. Hunt L. Grp., LLC*, 256 N.E.3d 479, 482 (Ill. App. Ct. 2024).

In Count V, Plaintiffs allege that Defendants tortiously converted their money. Specifically, Plaintiffs claim they have a right to the surplus value of their property above the taxes and fees owed; that the right is immediate, absolute, and unconditional; that they are excused from demanding possession where the defendant no longer possesses the chattel; and that Defendants wrongfully took the surplus value.[3] (Doc. 41 at ¶¶ 168-78). Defendants argue dismissal of this claim is proper because Plaintiffs have not alleged the Defendants actually retained any surplus equity beyond taxes and penalties owed.

In response, Plaintiffs cite to *Fortech, LLC v. R.W. Dunteman Co.*, 852 N.E.2d 451, 457 (Ill. App. Ct. 2006), for the proposition that Illinois law permits imposition of liability for conversion "even if the person is not directly benefitted by the tortious act." That case,

---

[3] Plaintiffs apparently only bring this claim on behalf of putative class members whose taxes were sold to third parties at a tax sale. (Doc. 41 at ¶ 174) ("If necessary, the Court could create a subclass of Plaintiffs specific to this claim to exclude those Plaintiffs whose land is still owned by the Defendants.").

however, involved principal-agent liability, and is inapposite here. Plaintiffs also argue that, under Illinois law, "[a]ltering a chattel to materially change its characteristics can constitute conversion, even if the defendant never comes into possession of the chattel." *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 782 (N.D. Ill. 2008). But there is no allegation here that the surplus value of the property was materially changed in any way. Because Plaintiffs have not alleged any facts supporting their bare claim that that the Defendants wrongfully assumed control, dominion, or ownership over any surplus money, their conversion claim in Count V is dismissed.

D. *Unjust Enrichment (Count VI) and Money Had and Received (Count VII)*

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672 (Ill. 1989). Similarly, "[a] cause of action for money had and received is maintainable where defendant has received money that in equity and good conscience belongs to the plaintiff." *Bueker v. Madison Cnty.*, 61 N.E.3d 237, 256 (Ill. App. Ct. 2016). As equitable remedies, unjust enrichment and money had and received are only available when there is no adequate remedy at law. *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004).

In Count VI, Plaintiffs claim that Defendants have been unjustly enriched from "their theft of the surplus value." (Doc. 41 at ¶ 179). They assert that the retention of the property or sale proceeds in excess of what a debtor owes is contrary to fundamental

principles of equity and justice. (*Id.* at ¶ 181). And for the properties that a County retains, it is unjustly enriched by the retention of the surplus value, either on an ongoing basis or when it sells the property. (*Id.* at ¶ 182). In Count VII for money had and received, Plaintiffs claim that Defendants received money (the surplus value) that in equity and good conscience belongs to Plaintiffs. (*Id.* at ¶ 184).

Defendants argue these claims must be dismissed because Illinois has recognized that the statutory remedy of the Indemnity Fund must be exhausted before equitable relief can be sought, and because the Defendant Counties did not retain any surplus.

Plaintiffs have alleged, however, that the Indemnity Fund is not an adequate remedy at law given that it is underfunded and is subject to a court's determination of equity. Furthermore, while the Court agrees that unjust enrichment and money had and received would not apply to any plaintiff whose tax lien was sold to a third-party tax buyer, Plaintiffs also allege that, in many instances, the county government retains the tax lien and directly forecloses, then sells the property for a profit. (*Id.* at ¶ 73). In those instances, the Court finds that Plaintiffs have adequate alleged claim for unjust enrichment and money had and received.

## V.    Statute of Limitations

Defendants raise the two-year statute of limitations for Plaintiffs' constitutional claims and the one-year statute of limitations for Plaintiffs' state law claims and suggest that any claims filed past the applicable statute of limitations should be dismissed. As an affirmative defense, however, the statute of limitations cannot be resolved on a Rule 12(b)(6) motion unless the allegations of the complaint demonstrate the claim is time-

barred. *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (statute of limitations defense "not often resolved on a Rule 12(b)(6) motion because a complaint need not anticipate and overcome affirmative defenses," . . . but dismissal can be appropriate "when the complaint alleges facts sufficient to establish that the suit is indeed tardy"). Here, the face of the Amended Complaint does not plead any facts that implicate the statute of limitations; therefore, resolution of the defense at this stage is inappropriate.

## VI.    Class Allegations

Defendants also move to strike the class allegations pursuant to Federal Rule of Civil Procedure 12(f), arguing only that the "bare allegations" of the Amended Complaint indicate any measure of damages will require an individualized assessment of damages. As the *Sharritt* court recognized, however, courts typically decide class certification after the parties have conducted class discovery and completed briefing on class certification. Given the infancy of this case, the Court declines to strike the class allegations, as doing so would be equivalent to denying class certification before any factual discovery. *Sharritt*, 2024 WL 4524501, at *9 (citing *Boatwright v. Walgreen Co.*, No. 10 C 3902, 2011 WL 843898, at *2 (N.D. Ill. Mar. 4, 2011) ("Because a class determination decision generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, . . . a decision denying class status by striking class allegations at the pleading stage is inappropriate.").

## VII.    Failure to Name Necessary Parties

Finally, Defendants assert the action should be dismissed because the third-party

tax buyers are necessary parties to the case under Rule 19 of the Federal Rules of Civil Procedure. Defendants submit that, while Plaintiffs seek the surplus value of their former properties, it is the tax buyers who have retained the benefits of any alleged excess equity. Thus, Defendants claim that the tax buyers are indispensable to this action.

"The purpose of Rule 19 is to 'permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources.'" *Askew v. Sheriff of Cook Cnty., Ill.*, 568 F.3d 632, 634 (7th Cir. 2009) (quoting *Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir. 1990)). "Dismissal, however, is not the preferred outcome under the Rules." *Id.* Here, Defendants have not explained why dismissal for failure to join the tax buyers (as opposed to joining the tax buyers) is appropriate in this case, so the Court rejects this argument.[4]

C<span style="font-variant:small-caps">ONCLUSION</span>

For these reasons, the Motion to Dismiss filed by Defendant David Harris (Doc. 53) is **GRANTED**. Defendant Harris is **DISMISSED without prejudice**.

The Motions to Dismiss filed by Defendants Madison County (Doc. 65), Chris Slusser (Doc. 66), St. Clair County and Andrew Lopinot (Doc. 67), Henry County and Kelly Vincent (Doc. 68), Sangamon County and McDonough County (Doc. 72), and Joe Aiello and Angela G. Graves (Doc. 73) are **GRANTED in part and DENIED in part**. Plaintiffs' claim for conversion under Illinois state law is **DISMISSED without prejudice**.

---

[4] Defendants also assert this Court should order the tax buyers to be joined, but the Court declines to do so at this point in the litigation. The parties may bring a motion to that effect under Rule 19 as appropriate.

This case will be set for a scheduling conference by separate Order.

**IT IS SO ORDERED.**

**DATED:   September 30, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**